.In the Matter of an Investigation into the Death of ABE A. JON L., Appellant; DISTRICT ATTORNEY, NEW YORK COUNTY, Respondent.

First Department, June 25, 1981

### APPEARANCES OF COUNSEL

*Lawrence Iason* of counsel *(Robert Kasanof* and *Howard E. Heiss* with him on the brief; *Kasanof Schwartz Iason*, attorneys), for appellant.

*Garry Greenfield* of counsel *(Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney*, attorney), for respondent.

### OPINION OF THE COURT

Ross, J.

Can a citizen who is a suspect in an ongoing homicide investigation, and against whom no criminal proceeding has been instituted, be compelled to provide a sample of his blood for analysis? A majority of this court concludes that it was error to require this blood extraction.

Jon L., the appellant herein, was the business partner of Abe A., the decedent. Deceased was last seen alive while parking his car at approximately 6:30 P.M. on January 15, 1980, in the garage of his apartment building located at 1385 York Avenue. Decedent was found by the police,

bludgeoned to death, the following day in his tenth-floor apartment. The cause of death was multiple lacerations of the scalp with contusions of the face and fractures of the larynx.

When decedent failed to arrive at work on the morning of January 16, appellant allegedly became concerned and attempted to contact his partner by telephone but received no answer. Appellant then called deceased's son-in-law to voice his concern. The latter proceeded to Jon L.'s office, at which time the police were informed of these circumstances and were requested to examine deceased's apartment. Appellant and deceased's son-in-law proceeded to the apartment where the police had already arrived. During the course of their investigation, the police found evidence of a violent struggle; blood was splattered throughout the apartment and a number of deceased's teeth were observed on the floor. In addition, there was no sign of forced entry into the apartment.

While at deceased's apartment, the investigating officer, Detective Acosta, noticed that appellant had abrasions on his face, that there were teeth marks on his hands and that his hands were swollen and bruised. This detective was of the opinion that the injuries sustained by appellant were consistent with the kinds of injuries he would have suffered had he engaged in a struggle with the deceased that resulted in the latter's death. Appellant explained that he received these injuries as the result of a mugging in the Chambers Street subway station at approximately 4:30 P.M. on January 15. Appellant claimed that an unidentified man approached him, asked him for the time of day and then grabbed for his watch. In an ensuing struggle the assailant clawed at appellant and grabbed his hand and bit it. Appellant, it is alleged, then blacked out for approximately one hour. No property was stolen from appellant and he failed to report this incident to the authorities. Although this crime took place at a busy subway station during the evening rush hours, the police could find no one who witnessed this incident.

The blood found in the apartment of deceased was analyzed by the office of the chief medical examiner. This sample

was found to consist of two different types of blood, one of which matched the blood type of the deceased and the other was a very rare type which is found in less than 1% of the population. It is the belief of the authorities that this blood sample is the blood of the assailant.

The District Attorney requested that appellant submit to a physician for the taking of blood samples. This request was rejected. Accordingly, on June 3, 1980, the District Attorney moved in Supreme Court, New York County, for an order compelling appellant to submit to the taking of blood samples. In support of this application, the People stated that "[t]*here is probable cause to believe that Jon L. caused the death of the deceased*" (emphasis supplied) and the People, therefore, contend that samples of appellant's blood are necessary for their investigation. Jon L. opposed this application on the grounds that he was not charged with a crime and that he had not been subpoenaed to appear before any Grand Jury. Subsequently, on August 1, 1980, the hearing court directed appellant to submit to the taking of blood samples from his body. Upon appellant's refusal to comply with this court order, a second order was then entered finding him in contempt of court pursuant to section 750 of the Judiciary Law, and sentencing him to 30 days in jail. However, this sentence was stayed pending determination of this appeal.

The Justice presiding made a finding that the People had made a sufficient showing that there was reasonable cause to assume that the decedent had been murdered by appellant. The Justice concluded that "case law supports both the general proposition that it is proper to enter an order involving an intrusion upon the rights of a person not yet charged with a crime and the specific proposition that, in a proper case, such a person may be compelled to submit to the extraction of a blood sample". The court in support of its order cited, *inter alia*, *Cupp v Murphy* (412 US 291), where the United States Supreme Court held that the police may properly extract scrapings from a suspect's fingernails by a court order, and *Schmerber v California* (384 US 757), where the court upheld the extraction of blood from a suspect without a court order. In addition,

the court found that the blood type discovered at the scene of the crime was rare and, therefore, would have probative value. The intrusion into the body of appellant was termed "trifling" and the application of the District Attorney was granted "[b]ased upon the probable cause shown and probative value of the evidence".

Appellant advances three reasons why the order should be reversed. Initially, he asserts that the court lacked the requisite jurisdiction to compel him to submit to the taking of blood samples. Secondly, he argues that the court improperly issued the order as there is insufficient cause to believe that the evidence which the District Attorney seeks will actually be found, and thirdly, that, even if such evidence were to be obtained it would not have any substantial evidentiary value.

The People rely heavily on *Schmerber v California (supra)* where the United States Supreme Court held that a defendant's Fourth, Fifth, Sixth and Fourteenth Amendment rights had not been violated when blood was withdrawn from his body after he had been *properly arrested* for drunk driving, and where the blood had been taken at the direction of a police officer without a court order (emphasis supplied). It is significant to note that in *Schmerber* what the police were seeking was evidence of alcohol in the blood system. It is common knowledge that with the passage of time the availability of such evidence diminishes until a point approaches when all traces of alcohol vanish from the blood system. Thereafter, a blood/alcohol ratio cannot be determined by means of any modern blood test. Accordingly, in *Schmerber*, time was truly of the essence from the viewpoint of the police investigation.

Even though the police had probable cause to arrest the drunken driver, Schmerber, this alone was deemed not sufficient to justify the taking of the blood sample. Rather the court held, that under those circumstances, there had to be a clear indication that the desired evidence would be found. Here, the trial court concluded that since appellant had been given adequate notice, had an opportunity to be heard and since the court issued an order compelling appellant to submit to the blood test, the clear indication standard is not required.

The People, in support of their position, also rely upon *Cupp v Murphy (supra)* wherein the defendant's wife was strangled to death, there were no signs of forced entry and the defendant had been at his wife's home the night of the crime. The police were aware that evidence of a strangulation was often found under the fingernails. In addition, the authorities noticed a spot on defendant's finger which could have been blood, so they forcibly took scrapings from defendant without a judicial order. The Supreme Court held that this search was appropriate since the police had probable cause to believe that defendant had murdered his wife, the intrusion was limited and the evidence could have been easily destroyed.

The question becomes, as is apparently conceded by both sides, whether the trial court had the authority to direct appellant, who had not been charged with any offense and who had not been arrested, to submit to the extraction of a blood sample from his body for the purpose of matching this sample to that blood found at the murder scene.

Pursuant to CPL 240.40 (subd 2, par [v]), the court in which an indictment or information is pending may require a defendant to provide nontestimonial evidence including, *inter alia,* blood samples as long as the evidence obtained is gathered "in a manner not involving an unreasonable intrusion" of his body. A second limiting factor imposed by this section is that the application of the People is subject to constitutional limitations. In addition, it is important to note that this statute applies only to a *post*arrest situation. There does not appear to be any provision in the CPL which authorizes the taking of blood prior to arrest. Subdivision 1 of section 1195 of the Vehicle and Traffic Law also authorizes the taking of blood samples to determine the alcohol level in blood only *after* an arrest has been made. However, this is not to suggest that courts are totally without prearrest authority. Suspects may be required to provide examples of their handwriting *(Matter of District Attorney of Kings County v Angelo G.,* 48 AD2d 576, app dsmd 38 NY2d 923). In the above case, the court balanced the governmental interest against that degree of intrusion upon the suspect to determine if the governmental action was reasonable. In that case the evidence sought was ex-

posed, on a daily basis, to the public. In the facts before this court, this element is lacking.

Here the evidence sought is entitled to, and indeed has been afforded, constitutional protection. The Fourth Amendment specifically provides: "[t]he right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" (emphasis supplied). As the United States Supreme Court stated in *Katz v United States* (389 US 347, 351-352) : "For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." As compared to a suspect's physical characteristics or his handwriting, which an individual "knowingly exposes to the public", what is more private than that which is beneath the outer layer of each person's skin?

When the Supreme Court was considering the intrusion upon a suspect to obtain fingernail scrapings, the court noted: "Unlike the fingerprinting in *Davis* [*Davis v Mississippi*, 394 US 721], the voice exemplar obtained in *United States v. Dionisio* [410 US 1], or the handwriting exemplar obtained in *United States v. Mara*, 410 U.S. 19, the search of respondent's fingernails went beyond mere 'physical characteristics . . . constantly exposed to the public,' *United States v. Dionisio, supra*, at 14, and constituted the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny" *(Cupp v Murphy, supra*, at p 295). Since the Supreme Court has characterized the intrusion upon a suspect to obtain fingernail scrapings as severe, how much more intrusive is it to obtain a blood sample from a suspect? That portion of the body discussed in *Cupp* (412 US 291, *supra)* and invaded by the authorities is exposed to the public more often than the blood of a suspect. The latter should then be entitled to greater protection than fingernails.

The compulsory extraction of a blood sample is clearly a process entitled to Fourth Amendment protection. "But if compulsory administration of a blood test does not im-

plicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment * * * Such testing procedures plainly constitute searches of 'persons', and depend antecedently upon seizures of 'persons', within the meaning of that Amendment" *(Schmerber v California, supra,* at p 767). Under the facts as presented by the record before us, there has been no seizure of the appellant and the means now utilized to obtain a sample of appellant's blood is unreasonable. In *Schmerber* (384 US 757, *supra)* the blood was removed without a court order, only after it was determined that the authorities had probable cause to arrest and did make a valid arrest. Here the District Attorney alleges he has probable cause to arrest but inexplicably has not detained appellant or commenced criminal proceedings against him.

In both *Cupp (supra)* and *Schmerber (supra)* the Supreme Court was dealing with evidence that was easily destroyed (fingernail scrapings) and evidence that was evanescent (alcohol in the blood system). In view of the nature of this evidence, the procedures employed by the police to secure and maintain its viability justified the intrusion. Here, where the evidence is not capable of destruction or transformation, but rather is permanent and not transitory, the means sought to be utilized are unreasonable. To permit such a "severe" intrusion would do injustice to the protections afforded each person by the Fourth Amendment. If this process were authorized, no individual would be secure in his or her person, and this we are not prepared to sanction.

Our dissenting colleague would classify this intrusion as "trivial", " 'a minor [intrusion] into an individual's body' " (citing *Schmerber,* at p 772). However, the Supreme Court clearly authorized the intrusion in *Schmerber* based only on the facts of that particular record. In concluding that court stated: "It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions

under other conditions." *(Schmerber v California, supra,* at p 772.)* The record before us is bare of the "stringently limited conditions" which were present in *Schmerber.* The appellant has not been arrested; the evidence is permanent and will not dissipate with time. "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained" *(Schmerber v California, supra,* at pp 769-770). If the police have probable cause to arrest, they should effect the arrest. However, if this is lacking, then the individual should be free from the intrusion which the People seek to impose upon him.

Accordingly, the order of the Supreme Court, New York County (ALTMAN, J.), entered on November 3, 1980, holding appellant in contempt of court for failure to comply with a prior order of August 1, 1980, directing the extraction of blood samples, should be reversed, on the law and on the facts, without costs and without disbursements, the contempt citation vacated and the order of August 1, 1980, dismissed as academic.

SILVERMAN, J. (dissenting). I would affirm the order appealed from.

The majority holds that the Supreme Court should not have granted an order directing appellant to permit the taking of samples of his blood primarily because no accusatory instrument has yet been filed against appellant.

None of us is so naïve as to think that that is the reason for appellant's objection. The appellant is objecting to the blood test at this stage because this is the stage at which the District Attorney is asking for it.

I can see no reasons of policy against requiring the appellant to furnish a sample of his blood at this time. Appellant has had full judicial protection. The order was made by a Justice of the Supreme Court on notice after full opportunity to appellant to be heard and with representation by counsel, and after a finding by the Supreme Court of probable cause to believe that appellant was guilty of the murder and that the blood sample will have probative value. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the

support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *(Johnson v United States,* 333 US 10, 13-14.) Here that protection has been fully accorded appellant.

The intrusion sought here is trivial, a "minor [intrusion] into an individual's body" *(Schmerber v California,* 384 US 757, 772); there can hardly be anyone in this country who has ever been attended by a physician who has not furnished a blood sample. And the court's order directed that the sample be taken by a medical doctor at Bellevue Hospital in the minimum amount necessary to permit proper analysis and in a manner involving the least risk of trauma or pain.

The Court of Appeals has recently considered a novel extension of the use of a search warrant to permit secret installation of a camera in a dentist's office and the secret video-taping of a crime expected to take place in that office. *(People v Teicher,* 52 NY2d 638.) In that case, the Court of Appeals set forth certain requirements for the novel extension of search warrants to video electronic surveillance which should be satisfied. Those requirements are: (1) a showing of probable cause, (2) particularization in the warrant, (3) minimization, (4) a showing that there are no less intrusive means for obtaining the needed evidence. Whether or not the requirements as to blood samples should be as rigorous as those for video surveillance by placing instruments in the privacy of the "surveilled" party's office, the fact is that these requirements are met in this case. (1) There have been a clear showing and judicial determination of probable cause. (2) The direction could hardly be more particularized—calling for the blood sample of a particular man to be taken at a particular hospital by a doctor. (3) Minimization is provided for. By the court's order the sample of blood to be taken is to be in the minimum amount necessary to permit proper analysis and in a manner involving the least risk of trauma or pain. (4) On a showing of probable cause to believe that

the appellant has committed the homicide, the finding of blood stains at the scene of the homicide, including a rare blood type which is not the blood type of the victim, the "needed evidence" is appellant's blood type. There are obviously "no less intrusive means for obtaining the needed evidence" *(People v Teicher, supra,* p 655) than taking a sample of his blood.

Appellant's rights would be in no way more protected if in fact an accusatory instrument had been filed against him. Indeed, arrest and indictment as preliminary to the issuance of the order in question would seem to intrude more significantly upon appellant's privacy than the blood test alone. Appellant has a legitimate interest in *not* being prosecuted. But what possible legitimate interest does he have in being prosecuted?

"It is well to remember that our goal is to protect the substantive rights of individual defendants, not ritualistically to impose requirements which add nothing to the protections afforded a defendant." *(People v Yut Wai Tom,* 53 NY2d 44, 54.)

There remain only technical objections, none of which I think should bar the order directing the taking of the blood sample.

There is ample authority permitting the court to require an unindicted suspect to furnish nontestimonial evidence. In *Schmerber v California* (384 US, at p 764) the Supreme Court sustained the involuntary drawing of a blood sample from a person who had in fact not yet been indicted or accused against objections that this violated his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. With respect to the privilege against self incrimination, the Supreme Court said (at p 764) : "[B]oth federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that com-

pulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

The courts of this State have frequently directed an unindicted suspect to furnish similar evidence (e.g., *Matter of District Attorney of Kings County v Angelo G.*, 48 AD2d 576, app dsmd 38 NY2d 923 [handwriting exemplar]). And this court's disapproval of an order directing an appearance in a lineup in *Matter of Alphonso C.* (50 AD2d 97, app dsmd 38 NY2d 923) was specifically based on the absence of a showing of probable cause. In *People v Vega* (51 AD2d 33, 37) in which the Appellate Division, Second Department, refused to direct an unarrested, unindicted person to have his beard removed prior to an appearance in a lineup, the court specifically pointed out the distinction between that case and taking a blood sample, saying: "In contrast to the facts in *Angelo G.* * * * we are not here dealing with fingerprinting, measurements, writing or speaking for identification, appearing in court, standing, assuming a stance, walking or making a particular gesture. *Nor are we dealing with the taking of a blood sample* (see *Schmerber v California*, 384 US 757)." (Italics mine.)

In addition to the court's inherent power, I think the recent decision of the Court of Appeals in *People v Teicher* (52 NY2d 638, *supra*) is authority for sustaining the present procedure as within the search warrant powers of the court or a reasonable extension thereof. In the *Teicher* case the Court of Appeals sustained the secret making of video images pursuant to an order made in advance of the criminal activity to be video taped. It sustained this procedure under the search warrant provisions of CPL article 690 even though the search warrant statute relates to the seizure of "[p]ersonal property" (CPL 690.10); the court held that the reference to seizure of personal property was broad enough to include the "seizure of an intangible visual image secured by a video recording." *(People v Teicher, supra,* p 651.) But if that "seizure" of intangible visual images is within the permissible scope of a search warrant, I cannot see why the seizure of some blood by a blood sample is not within the permissible scope of such a warrant. At most, the present case involves only a minor extension or modification of the court's search warrant power, well

within the power of the court "to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it" (Judiciary Law, § 2-b, subd 3). For example, the search warrant statute requires that the warrant be addressed to a police officer (CPL 690.25); in the case of a blood sample, it is obviously sensible to modify this to direct that a doctor take the blood sample. Thus I think the order here involved may either be deemed a search warrant authorized by CPL article 690 or a "new process" analogous to a search warrant authorized by section 2-b of the Judiciary Law.

Appellant points to the recently enacted provisions of CPL 240.40 (subd 2) authorizing the court to direct a defendant, among other things, to permit the taking of samples of blood, etc., and argues that thus the court only has such power to make such an order with respect to a defendant against whom an accusatory instrument has been filed. The complete answer to this is the statute's own rejection of that limitation in the last unnumbered paragraph of subdivision 2 of CPL 240.40: "This subdivision shall not be construed to limit, expand, or otherwise affect the issuance of a similar court order, as may be authorized by law, before the filing of an accusatory instrument consistent with such rights as the defendant may derive from the constitution of this state or of the United States." The statute is merely a recent regulation of rights of discovery as between prosecutor and defendant. It does not affect rights with respect to someone who is not a defendant.

Appellant cites CPL 10.20 (subd 2) : "2. Superior courts have preliminary jurisdiction of all offenses, but they exercise such jurisdiction only by reason of and through the agency of their grand juries." Appellant argues that under this statute, until the Grand Jury has acted, the Supreme Court can do nothing; i.e., that in addition to whatever objections may be applicable in another court, this statute presents a bar to the jurisdiction of the Supreme Court, a bar obviously not present with respect to courts that do not have Grand Juries. Whatever this statute may mean, it can hardly have the effect appellant argues for in the present case.

To begin with, if we assume that in ordering appellant to furnish a blood sample, the Supreme Court Justice was exercising the powers of a local criminal court, it is hard to see why the Supreme Court Justice does not thereby become for that purpose a local criminal court, i.e., "A supreme court justice sitting as a local criminal court." (CPL 10.10, subd 3, par [f].)

But a more important flaw in appellant's argument is its failure to give due weight to the extraordinary unlimited constitutional jurisdiction of the Supreme Court. As I have indicated, the Supreme Court and other superior courts have traditionally exercised the power here referred to before any action by the Grand Jury. If this statute has the effect contended for, it would seem to follow that a local criminal court has jurisdiction which the Supreme Court does not have.

We need not try to analyze the precise meaning of this section, for the particular "superior court" here involved is the Supreme Court of the State of New York. And the Supreme Court has not only the jurisdiction granted to it as a superior court by statute, but also the much broader and indefeasible jurisdiction granted to it by the State Constitution, jurisdiction which no statute can take away from it. The "Supreme Court is a court of original, unlimited and unqualified jurisdiction." *(Kagen v Kagen,* 21 NY2d 532, 537.) Article VI (§ 7, subd b) of the State Constitution provides in part: "b. If the legislature shall create new classes of actions and proceedings, the supreme court shall have jurisdiction over such classes of actions and proceedings, but the legislature may provide that another court or other courts shall also have jurisdiction". This "amendment removed all limitation previously imposed upon the court's jurisdiction." *(Kagen v Kagen, supra,* at p 536.) Under this constitutional provision, if any court has jurisdiction to render a particular kind of relief, the Supreme Court has that jurisdiction, notwithstanding even a statute providing that some other court shall have exclusive jurisdiction. (See, e.g., *Kagen v Kagen,* 21 NY2d 532\*, *supra;*

---

\* For special reasons the Court of Claims is an exception. *(Kagen v Kagen, supra,* at p 538.)

see, also, *Matter of Alphonso C.*, 50 AD2d, at p 99.) In particular, the Supreme Court has the jurisdiction of a local criminal court. The Legislature cannot grant "jurisdiction to local criminal courts and withhold the same from the Supreme Court." *(People v Darling,* 50 AD2d 1038.) It follows that the statute cannot constitutionally bar the jurisdiction of the Supreme Court.

MURPHY, P. J., and KUPFERMAN, J., concur with ROSS, J.; SILVERMAN, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on November 3, 1980, reversed, on the law and on the facts, without costs and without disbursements, the contempt citation vacated and the order of August 1, 1980, dismissed as academic.