OPINION OF THE COURT
Fuchsberg, J.
One of the greatest contributions of American law may be the protection it affords the individual against the power of the government itself. However, the values this bespeaks often require a delicate balancing of the individual interest in privacy and dignity against circumstances which may call for intrusion by organized society. In this context, we now are called upon to determine the exr tremely sensitive issue of whether a suspect in a homicide investigation may be compelled, pursuant to court order, to supply the People with corporeal evidence, in this case in the form of a sample of his blood for scientific analysis.
The question has yielded diverse opinions in the lower courts of this State (compare, e.g., People v Vega, 51 AD2d 33; Matter of Alphonso C. [Morgenthau], 50 AD2d 97, app dsmd 38 NY2d 923; and Matter of Mackell v Palermo, 59 Misc 2d 760, with Matter of District Attorney of Kings *291 County v Angelo G., 48 AD2d 576, app dsmd 38 NY2d 923; People v McClain, 88 Misc 2d 693; People v Mineo, 85 Misc 2d 919; and Matter of Merola v Fico, 81 Misc 2d 206; cf. People v Middleton, 54 NY2d 42 [postarrest order]). Not unexpectedly, it has troubled commentators as well (see, e.g., Note, Detention to Obtain Physical Evidence Without Probable Cause, 72 Col L Rev 712; Note, Constitutional Limitations on the Taking of Body Evidence, 78 Yale LJ 1074).
It is in this perspective that, for the reasons which follow, we hold a court order to obtain a blood sample of a suspect may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a “clear indication” that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable. In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect’s constitutional right to be free from bodily intrusion on the other. Only if this stringent standard is met, as we conclude it was here, may the intrusion be sustained.
The proceedings in which we apply these principles are the aftermath of the discovery on January 16, 1980 that Abe A.,[1] business partner of Jon L., respondent on this appeal, had been bludgeoned to death in his Manhattan apartment. There was dramatic evidence' of a violent struggle. His head contained multiple lacerations, his face was severely contused, his larynx crushed. Blood was spattered throughout the apartment and five teeth, missing from the decedent’s mouth, were on the floor. Yet, there were no signs of a forced entry. Abe A. had last been seen alive in the early evening of the previous day when an attendant saw him park his car in the building’s garage; the car was still there when the body was found.
Entry of the apartment had been effected after Jon L., who claimed that he had become concerned when his *292 partner had not arrived to keep a business appointment that morning, after receiving no answer on attempting to telephone Abe A. at home and learning that Abe A.’s car was still in the garage, called the police. After coming on the scene, an investigating detective who met Jon L. and the deceased’s son-in-law there observed that Jon L. had abrasions on his face and swellings and bruises on both hands, one of which bore tooth marks as well. The officer was struck by the fact that these were just the kind of injuries Abe A.’s assailant would have been likely to have received in the encounter which preceded the death. But inquiry of Jon L. only elicited the statement that he had sustained them while fending off an unsuccessful “mugging” robbery in the passageway leading to a busy subway station during the 4:30 p.m. “rush hour” on the previous day, an episode which, though allegedly causing him to be rendered unconscious for about an hour, he did not report to the police. The wristwatch for which the robber initially had lunged had not been taken. Neither a survey made that day among passengers who had traversed the same area at the approximate time when Jon L. said he was assaulted nor interrogation of a transit police department officer who had patrolled the passageway during that period brought any corroboration.
Thereafter, when analysis of the blood found in the murdered man’s apartment revealed it was of two types, one matching that of the deceased and the other a relatively rare one which was to be found in less than 1% of the population, the District Attorney requested Jon L. to voluntarily submit to the taking of blood samples for a blood-grouping test from which its type would be ascertained. Jon L. having persistently refused to comply, the District Attorney, reciting the afore-mentioned facts, and on notice to Jon L., moved in Supreme Court, New York County, for an order to compel him to do so.
At Criminal Term of that court, the Justice presiding having expressly found that “there is probable cause to believe that A.A. was murdered and that J.L. is guilty of that murder”, that the evidence sought “clearly” is probative and that the intrusion would be “trifling”, granted the application. He also cautioned that the blood must “be *293 drawn in the minimum amount necessary to permit proper analysis * * * by a medical doctor in a medical environment * * * in a manner involving the least risk of trauma or pain”. The order he entered on this decision specified that the extraction of the blood take place at Bellevue, a city hospital, in the presence of a police detective charged with the duty of transporting it to the serology section of the New York City Medical Examiner’s office for analysis. It also provided for the sealing of the file in this matter.
Under New York law, there is no statutory authorization for direct appellate review of such an order (see Matter of Alphonso C. [Morgenthau], 38 NY2d 923, supra). The substantive question at stake nevertheless entered upon the appellate track when, Jon L. having failed to comply with the order, the People moved, pursuant to section 750 of our Judiciary Law, to punish him for willful disobedience of the “lawful mandate of the Court”. Though pronouncing him guilty of criminal contempt and imposing a sentence of 30 days’ imprisonment, the resulting order stayed execution of the punitive action pending appellate review, with the further proviso that, if it were upheld, Jon L. could purge himself by complying with the underlying direction.
This eventuality did not occur. Instead, a divided Appellate Division reversed the contempt order and, concomitantly, dismissed the order directing the giving of blood as academic (81 AD2d 362). The majority, without challenging the findings concerning probable cause or the probative quality of what the blood test would disclose, nonetheless was of the view that, because Jon L. had not been formally charged with any criminal offense, much less arrested, at the time the .underlying order was made, it ran counter to Fourth Amendment protections. On the People’s appeal to this court, we now reverse.
Preliminarily, we examine Criminal Term’s authority to compel production of the blood. In this connection, we note that, while in many States statutes or rules authorize their courts to compel a person whose status is no more than that of a suspect to supply nontestimonial evidence (e.g., 5A Ariz Rev Stat Ann, § 13-3905; Col Rules of Crim Pro, rule § 41.1; 4 Idaho Code, § 19-625; NC Gen Stat, § 15A-271 et sea.; Utah Code Ann, § 77-8-1; see ALI Model Code of *294 Prearraignment Procedure, App VIII), our Criminal Procedure Law does not. And, absent express authorization, we have not favored importing, such power by implication (People v Gersewitz, 294 NY 163,167, cert den 326 US 687; People ex rel. Hirschberg v Orange County Ct., 271 NY 151, 155; Matter of Mollis v Cauise, 38 Misc 2d 179). Nor, therefore, are general enactments, such as section 2-b of the Judiciary Law to be construed to fill any supposed void (Matter of Alfonso C. [Morgenthau], 50 AD2d 97, app dsmd 38 NY2d 923, supra). Rather, we are as one with the Michigan Court of Appeals, which, when confronted with a like issue, graphically put it that “there is no such ‘animal’ in this jurisdiction as a court order authorizing the detention of a suspect for the purpose of a search” (People v Marshall, 69 Mich App 288, 300; see, also, Israel, Legislative Regulation of Searches and Seizures, 73 Mich L Rev 222, 310-314).[2]
As Marshall also observes, however, equivalent judicial authority may be exercised under a court’s power to issue a search warrant (69 Mich App, at p 300). Nomenclature notwithstanding, if the application and the relief comport with all the requisites of a search warrant, it may be taken for what it is (id., at pp 300-302; United States v Allen, 337 F Supp 1041; Mills v State, 28 Md App 300, 307; cf. Schmerber v California, 384 US 757, 770).
So perceived, CPL 690.05 (subd 2) fits the search warrant bill. In so many words, it empowers a criminal court to order “a search * * * of a designated person” in order to seize specified property which, as defined in CPL 690.10 (subd 4) “[c]onstitutes evidence or tends to demonstrate that an offense was committed or that a particular person participated in the commission of an offense”. It requires no reach then to hold that the blood samples which are the target of the order in the proceeding before us now come well within these provisions (cf. People v Teicher, 52 NY2d 638, 651).
*295 Turning then to the constitutional issues which confront us on this appeal, Fourth Amendment safeguards should be seen as implicated at two discrete levels. These are, first, “the ‘seizure’ of the ‘person’ necessary to bring him into contact with government agents” and, second, “the subsequent search for and seizure of the evidence” (United States v Dionisio, 410 US 1, 8). Each deserves separate analysis.
First, with regard to the “detention” — and thus the “seizure” — of an individual to obtain physical evidence, we begin by acknowledging that there are jurisdictions which have authorized such seizures on a standard below that of probable cause to arrest (e.g., State v Grijalva, 111 Ariz 476; State v Watson, 294 NC 159). But it is hard to regard such holdings as constitutionally firm. For, in Cupp v Murphy (412 US 291 [removal of fingernail scrapings]) and in Schmerber v California (384 US 757 [testing for alcohol in blood]), the Supreme Court, while in each case excusing the absence of a warrant because of “the ready destructibility of the evidence”, emphasized that the police had the requisite probable cause (Cupp v Murphy, supra, at pp 294-296; Schmerber v California, supra, at pp 770-771). Further, whatever doubt dicta may have introduced into the subject in Davis v Mississippi (394 US 721, 727-728) has been dispelled by Dunaway v New York (442 US 200), which squarely held that the seizure of a person can never be undertaken for less than probable cause. (See, generally, United States v Crowder, 543 F2d 312 [en banc], cert den 429 US 1062; United States v Jennings, 468 F2d 111, 115; Matter of Grand Jury Proceedings [Mills], 522 F Supp 500).
True it is that in Cupp and in Schmerber, judicial determination of probable cause was not made prior to the seizure, but, as we have already indicated, this was held permissible in those cases only because of exigent circumstances. A fortiori, when there is no danger of imminent destruction of the evidence for the procurement of which a person is to be detained, the rule is to the contrary. Indeed, this rule applies even when an inanimate object like a dwelling is seized so it can be searched for evidence (see, e.g., United States v Allard, 634 F2d 1182). Surely, then, *296 when the physical evidence whose possession is the raison d’etre for detaining a person cannot be altered or destroyed, as in the case of the type of blood integral to one’s body (Graves v Beto, 301 F Supp 264, 265, affd 424 F2d 524), by definition there can be no exigency to justify exemption from the warrant standard of probable cause (US Const, 4th, 14th Arndts; NY Const, art I, § 12; United States v Allen, 337 F Supp 1041, supra; People v Marshall, 69 Mich App 288, 300, supra; Mills v State, 28 Md App 300, supra).
At this point it seems appropriate to add, since here there was no exigency, that the course followed by the People in bringing on its original application on notice to the suspect was no more than is required by such circumstances (see, e.g., United States v Crowder, 543 F2d 312, 316, supra; State v Martin, 404 So 2d 960 [La]). After all, when frustration of the purpose of the application is not at risk, it is an elementary tenet of due process that the target of the application be afforded the opportunity to be heard in opposition before his or her constitutional right to be left alone may be infringed (cf. Matter of Barber v Rubin, 72 AD2d 347, 352 [Hopkins, J.] [extraction of hair and their roots]).[3]
This also may be a good juncture at which to express our disagreement with the Appellate Division’s conclusion that a formal charge that he had committed the crime was a prerequisite for the judicial directive that Jon L. make himself available for the drawing of the blood. We can find no case in which a court of general jurisdiction has been held to be without power to authorize a seizure or a search until a suspect is arrested and actually charged with a crime (cf. Zurcher v Stanford Daily, 436 US 547). So, in Cupp v Murphy (412 US, supra, at p 294), the Supreme Court held the seizure of the fingernail scrapings there *297 permissible though the defendant had not been “formally arrested”. A like holding, significantly this time in a blood extraction case, may be found in Aliff v State (627 SW2d 166, 168-170 [Tex]).
Pragmatically put, “There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect * * *. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.” (Hoffa v United States, 385 US 293, 310.)
Beyond this, we fail to see how a formal arrest requirement would be any more protective of individual liberty. The procedure utilized here not only avoided the more extended detention inevitably entailed in formal arrest procedures, but, because of the sealing order, the suspect was able to keep his identity within private confines. Or, as Justice Silverman rhetorically asked in his dissent at the Appellate Division, “Appellant has a legitimate interest in not being prosecuted. But what possible legitimate interest does he have in being prosecuted?” (81 AD2d, at p 371.)
This said, we now come to the second level of our Fourth Amendment inquiry, a multifaceted one focusing on the bodily intrusion itself.
To begin with, “clear indication” that the intrusion will supply substantial probative evidence is a sine qua non (Cupp v Murphy, 412 US 291, 295, supra; Schmerber v California, 384 US 757, 770, supra). This requirement, by insuring that the evidence expected to be found is of importance, guards against a “fishing expedition”. Needless to say, most often facts which would establish probable cause will also tend to establish the high degree of relevance the nontestimonial evidence sought would have (Schmerber v California, 384 US, supra, at p 770).
Next, the method by which the authorized intrusion is to be accomplished must be safe, reliable and impose no more physical discomfort than is reasonably necessary (United *298 States v Crowder, 543 F2d 312, supra; People v Scott, 21 Cal 3d 284; cf. Rochin v California, 342 US 165). When, as here, the body is to be invaded, the procedure should be carried out by a qualified physician in accordance with accepted medical standards (Schmerber v California, 384 US, supra, at pp 771-772).
Finally, before authorizing the intrusion, the court must give careful consideration to the circumstances of the particular case. These should include, for instance, not only the probable worth of the evidence to the investigation, but the nature of alternative means, if any, for obtaining the evidence (People v Scott, 21 Cal 3d 284, 293, supra; Matter of Barber v Rubin, 72 AD2d 347, 353, supra; cf. People v Teicher, 52 NY2d 638, 655, supra).
These standards in mind, we cannot say that the facts were insufficient to justify Criminal Term’s finding of probable cause that Jon L. committed the crime under investigation, a finding the Appellate Division did not disturb. Furthermore, unlike the dragnet operation condemned in Davis v Mississippi (394 US 721, supra), Jon L. is the only suspect. It is, to say the least, a strange coincidence that this man, who had such ready access to the decedent, bore injuries which dovetailed with those the deceased’s assaulter might be expected to have sustained, even to the detail of the tooth marks. In juxtaposition to this fact, the further coincidence that Jon L.’s injuries allegedly were sustained during the same time span in which the murder was committed is almost equally strange. And, taking Jon L.’s unreported explanation for his injuries at face value, the inability of prompt police investigation to unearth a single patron of the heavily trafficked subway station who witnessed either the mugging or any part of the ensuing unconsciousness or, for that matter, the failure of any one of the hundreds of passengers who traversed the area during the hour when he was prostrate to give aid or seek medical or other assistance is also more than passing strange. In toto, it cannot be concluded as a matter of law that Jon L. has been singled out as the prime suspect without good cause or that there was not a substantial factual predicate on which nisi prius could have posited its finding of probable cause.
*299 Nor can there be any serious question but that Jon L.’s blood type would constitute material probative evidence. The serological tests having established that a type of blood other than that of Abe A. was found on the walls and floors of his apartment, it was not unreasonable to assume it was that of the killer. That the incidence of the presumed killer’s blood type in the general population is less than one to a hundred is well documented by medical statistics. The scientific validity and reliability of tests used to identify the type of blood a particular individual carries and to determine whether the blood of one person matches that of another are well recognized in both the medical and legal communities (Moenssens, Moses and Inbau, Scientific Evidence in Criminal Cases [1973 ed], §§ 6.13, 6.16; Soderman and O’Connell, Modern Criminal Investigation [5th ed], pp 242-253; Gross, Criminal Investigation [5th ed], pp 103-106; McCormick, Evidence [2d ed], § 211, pp 517-523; Blood Grouping Tests, Ann., 46 ALR2d 1000, §§ 11,17,18). Moreover, the relative rarity of the assailant’s type of blood relegates arguments as to remoteness to the realm of weight rather than admissibility (cf. People v Yazum, 13 NY2d 302).[4]
Lastly, we observe that no alternative means of obtaining the evidence was brought forward and the order to submit to the taking of the blood, in today’s world hardly less routine than taking one’s temperature, respected minimization requirements.
From all this it follows that the order of the Appellate Division should be reversed, without costs, and the orders of Criminal Term should be reinstated.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur with Judge Fuchsberg; Judge Gabrielli concurs in result only.
Order reversed, without costs, and the orders of Supreme Court, New York County, reinstated.

. Criminal Term and the Appellate Division each utilized this anonym to keep the identity of the parties confidential. To protect the presumptively innocent respondent, - we continue to use it on this appeal.

. Our decision in People v Middleton (54 NY2d 42, supra) is not to be read as authority for such orders. There the criminal proceeding already had been commenced, so the order was issued against one who already was a defendant. In this circumstance, CPL 240.40 (subd 2, par [a]) would appear to authorize the issuance of such an order.

. We here have no occasion to decide whether the Federal Constitution required that appellate review be made available prior to submission to the intrusion in this case (e.g., United States v Crowder, 543 F2d 312, 316, supra; cf. Note, Detention to Obtain Physical Evidence Without Probable Cause, 72 Col L Rev 712, 735-737). The technique employed here — appeal from conditional contempt — or an article 78 proceeding (see Matter of Barber v Rubin, 72 AD2d 347, 350-352, supra) in any event provides a constitutionally adequate substitute (see Matter of Wiley v Altman, 52 NY2d 410, 412-413, n 2).

. Suffice it here to say that People v Macedonia (42 NY2d 944) and People v Robinson (27 NY2d 864), cited for the contrary proposition by the respondent, each dealt with type A blood, which is found in 40% of the population.