OPINION OF THE COURT
Patrick D. Monserrate, J.
Following the arraignment of the defendant on an indictment charging him with the class D felony crime of assault in the second degree (Penal Law, § 120.05, subd 4), as well as the unclassified misdemeanor crimes of operating a motor vehicle while in an intoxicated condition (Vehicle and Traffic Law, § 1192, subd 3) and operating a motor vehicle while under the influence of alcohol (Vehicle and Traffic Law, § 1192, subd 2), counsel for the defendant has moved this court, pursuant to CPL article 710, for an order suppressing the use by the People at the trial of this matter of the results of the chemical analysis for the presence of alcohol of a sample of the defendant’s blood *331 withdrawn for that purpose during the early morning hours of July 29, 1982.
The People oppose the motion to suppress.
An evidentiary hearing on the defendant’s motion was held before the court on February 28, 1983.
FINDINGS OF FACT
The following facts are found by the court beyond a reasonable doubt and where the findings represent facts supported by differing or conflicting testimony, such discrepancies or contradictions are resolved beyond a reasonable doubt.
During the early morning hours of July 29, 1982, Trooper Anthony P. Elwood of the New York State Police, had occasion to respond to a call at the Twin Rivers Inn, a tavern located in the Village of Whitney Point (Broome County). One of the people whom he recalled seeing at the inn during that call was the defendant. His observations of the defendant at that time did not lead him to conclude that the defendant was in an intoxicated condition and he did not suggest or direct that the defendant not operate a motor vehicle.
At about 3:00 a.m. — within minutes (more than 10 but less than one hour) after this initial encounter with the defendant — Trooper Elwood received a radio transmission directing him to investigate a vehicular accident which had recently occurred in the northbound lanes of Interstate Route 81 at a point one tenth of a mile north of the intersection of Route 81 with New York State Route 26 in the Town of Triangle (Broome County).
Proceeding to that location, Trooper Elwood found that there were two vehicles which had been in collision. A northbound tractor trailer was involved in a head-on collision with a passenger vehicle operated by the defendant (with one Dennis Enright as his passenger), which vehicle was being operated in a southbound direction in the northbound lanes of the limited access four-lane divided highway. Trooper Elwood determined that additional assistance would be required in order to extricate the defendant and his passenger from the wreckage of their vehicle. *332 While the rescue effort was in process, Elwood engaged the defendant in conversation. He found the defendant to be aware of his predicament: he repeatedly inquired after the welfare of his passenger and indicated he was “sorry” the accident had happened. During this conversation Trooper Elwood detected an odor of alcoholic beverage coming from the defendant’s mouth. After some 35 minutes, the defendant and his passenger were freed from the vehicle and the defendant was taken by ambulance to Wilson Memorial Hospital in the Village of Johnson City.
The defendant arrived at the hospital at approximately 4:45 a.m. He was taken to the emergency room and placed in treatment room No. 4 where he was attended to by nurses and doctors including a staff registered nurse named Judith Romano wski. The treatment took several forms. Two intravenous solutions were initiated into his veins, open wounds to his forehead and leg were cleansed and dressed, a urinary catheter was inserted, oxygen was administered through a nasal tube, and X rays were taken. No drugs were administered to the defendant (due to the possibility that he had sustained some brain injury).
When first seen by nurse Romano wski, she described the defendant as being disoriented and confused with the pupil of his left eye in a “fixed and dilated” condition (indicating to her the possibility of brain trauma and/or injury to the eye). The nurse testified that after an unspecified period of time (probably in the vicinity of 30 to 45 minutes), the defendant’s condition had stabilized sufficiently in her judgment to permit him to be interviewed by the State Police.
Trooper Elwood had arrived at the hospital at about 5:00 a.m. and had made known his desire to see the defendant for the purpose of attempting to obtain a blood sample for later analysis to determine its alcohol content. After some 20 to 30 minutes, he was escorted to the treatment room where the defendant was confined and engaged him in conversation. He told the defendant that he was under arrest “for driving while intoxicated” to which the defendant responded, in words or substance, that he understood what the officer was saying. The defendant was then advised by Trooper Elwood, using a printed card which he *333 carried for that purpose (a photocopy of which was received as Hearing Exhibit No. 1), of his rights with respect to a chemical test for intoxication (pursuant to Vehicle and Traffic Law, § 1194). Upon being so advised, the defendant indicated that he would agree to the withdrawal of a blood sample for the purpose of a chemical test.
Before the blood sample was withdrawn, nurse Romanowski and other hospital personnel filled out a hospital consent form (of which Hearing Exhibit “A” is a certified photocopy). Romanowski attempted to explain the form to the defendant and she testified that he appeared to understand its meaning and “signed” the form. The defendant’s “signature” is little more than a mark on the signature line (something resembling an “x”), which was explained by the nurse as being caused by the defendant’s injuries and encumbrances (his inability to sit up due to his leg injury, the various intravenous needles in his arms, his being connected to a vital signs monitoring machine and the fact that his left eye was bandaged due to the laceration in that area). Within a few minutes thereafter (which the parties stipulated, and the record circumstantially supported, was within two hours from the time when Trooper Elwood indicated he had placed the defendant under arrest), a sample of the defendant’s blood was withdrawn by a physician and handed to Trooper Elwood.[1] It is the subsequent chemical analysis of this blood sample which the defendant now moves to suppress from use in evidence against him.
CONCLUSIONS OF LAW AND REASONS
i) THE GENERAL PROBLEM
New York State’s declared war against the army of intoxicated drivers who daily — and nightly — threaten the citizen users of its highways has reached the courts. *334 With increasing frequency, New York’s tribunals are asked to decide questions of fact and law related to the prosecution of persons charged with criminal offenses under both the Penal Law (manslaughter, second degree [§ 125.15, subd 1]; criminally negligent homicide [§ 125.10]; assault, second degree [§ 120.05, subd 4]; assault, third degree [§ 120.00, subds 2, 3]; reckless endangerment, first degree [§ 120.25]; reckless endangerment, second degree [§ 120.20] and the Vehicle and Traffic Law (operating while intoxicated [§ 1192, subd 3]; operating while under the influence of alcohol [§ 1192, subd 2]; operating while ability impaired by alcohol [§ 1192, subd 1]; or any drug [§ 1192, subd 4]; reckless driving [§ 1190]), arising out of the operation of a motor vehicle while under the influence of alcohol or drugs to some degree or extent.
Too often these cases involve instances where persons are killed or injured through the actions of the “drunken driver” — and often enough the poetry of justice finds the culprit to be one of his own victims. Where he, or she, survives (far more often than do their innocent victims) but sustains injury from the automobile accident they precipitated, law enforcement personnel deal with the dilemma of gathering evidence from a criminal suspect, who is at the same time a medical patient. Often central to this effort — as in the case under review — is the attempt to obtain (in time to assure its relevancy) a blood sample from the suspect/patient which may later be chemically analyzed for its alcohol (or other drug) content, and the results of such analysis may ultimately be used as incriminating evidence in a criminal prosecution.
In the recent past, several cases dealing with various aspects of the legal implications of this recurring fact pattern have provided the opportunity for a discussion of the problem by the Court of Appeals and the several Appellate Divisions (People v Kates, 53 NY2d 591, affg 77 AD2d 417; Matter of Abe A., 56 NY2d 288, revg 81 AD2d 362; People v Moselle, Daniel, Wolter, 57 NY2d 97, affg People v Daniel, 84 AD2d 916, People v Wolter, 83 AD2d 187; People v Curran, 90 AD2d 661; People v Hall, 91 AD2d 1002).
*335 From a reading of these cases, one is first impressed with the realization that they deal with an area of the law which is in transition; and that they have their common factual bases in diverse settings beginning with the blood and mental confusion of the highway accident scene, proceeding through the life-and-death atmosphere of a hospital emergency room and culminating in the cold dispassionate daylight of the courtroom.
The consensus of these decisions would seem to indicate that the question of whether the chemical analysis of a blood sample obtained from such a suspect/patient may be later used in evidence against him is to be answered by resolving two threshold issues: by what procedure was the sample obtained in the emergency room; for what type of criminal charge is it proposed to be used in the courtroom.
i-a) obtaining the blood sample
The first problem facing law enforcement personnel in the context of the injured and hospitalized suspect concerns how they may go about obtaining a sample of the suspect’s blood (which may later be analyzed for its alcohol/other drug content), so as to insure that the analysis may be legally admissible evidence against the defendant in a subsequent prosecution.
At this point in time, the New York courts offer three courses: the blood sample may be obtained with the implied consent of the suspect, with the suspect’s express consent or pursuant to a court order.
1.) WITH IMPLIED CONSENT
Subdivision 1 of section 1194 of the Vehicle and Traffic Law states: “Any person who operates a motor vehicle in this state shall be deemed to have given his consent to a chemical test of his * * * blood * * * for the purpose of determining * * * [its] alcoholic or drug content”.
The Court of Appeals has consistently interpreted New York’s “implied consent law” to mean what it says, and that, where the police follow the procedural requirements of section 1194, they may be reasonably assured that their efforts will result in obtaining legally admissible evidence — even from seriously injured suspects.
*336 Thus, where an officer, with “reasonable grounds to believe” that the suspect has been operating a vehicle in violation of any of the offenses proscribed under section 1192, arrests him/her, requests the person’s consent for the taking of blood, and advises such person of the effect of refusing to permit the test to be conducted, then the officer need only have the blood sample withdrawn by an appropriate professional within two hours of the time he made his arrest in order to have done all that he need do to assure the later admissibility of the blood alcohol test for offenses under section 1192. It is immaterial whether the suspect/patient knows what is transpiring, understands it, or consents to it — so long as he/she does not refuse.
Judge Wachtler, writing for the majority in Kates, made the specific point that the unconscious/disoriented suspect is as bound by the implied consent law as he would be were he fully aware of the events going on around him (and that no constitutional infirmity results from such a distinction — or the lack of it). “The distinction drawn between the conscious driver and the unconscious or incapacitated driver does not offend the equal protection clause. It was reasonable for the Legislature, concerned with avoiding potentially violent conflicts between the police and drivers arrested for intoxication, to provide that the police must request the driver’s consent, advise him of the consequences of refusal and honor his wishes if he decides to refuse, but to dispense with these requirements when the driver is unconscious or otherwise incapacitated to the point where he poses no threat. Indeed there is a rational basis for distinguishing between the driver who is capable of making a choice and the driver who is unable to do so. Thus, denying the unconscious driver the right to refuse a blood test does not violate his right to equal protection.” (People v Kates, supra, p 596.)
Conversely, the failure by the police to follow the “arrest/ request/advice” procedure required by the statute (People v Moselle, Daniel, 57 NY2d 97, supra) or the suspect’s refusal to permit the withdrawal of the blood sample (People v Walter, 57 NY2d 97, supra) will, of course, preclude subsequent admissibility of the results of the chemi *337 cal analysis of the sample where such evidence is offered under the “implied consent” theory.
2.) WITH EXPRESS CONSENT
The concept that a person’s affirmative consent may serve as an appropriate basis for the withdrawal (and later admissibility) of a blood sample is dealt with in the cited cases more through incorporation by reference than as a specific factor involved in any particular decision. “Absent a manifestation of a defendant’s consent thereto, blood samples taken without a court order other than in conformity with the provisions of subdivisions 1 and 2 of section 1194 of the Vehicle and Traffic Law are inadmissible in prosecutions for operating a motor vehicle while under the influence of alcohol under section 1192 of that law. Beyond that, blood samples taken without a defendant’s consent are inadmissible in prosecutions under the Penal Law unless taken pursuant to an authorizing court order.” (People v Moselle, supra, p 101; emphasis added.)
While the course of action suggested by this alternative may appeal to some police officers for its apparent simplicity and economy of action,[2] in the context under discussion it may be the most hazardous route to admissibility. The term “consent” here is synonymous with a waiver of an individual’s fundamental constitutional right not to have his person unreasonably searched, seized or intruded upon — in sum, his right to be left alone.
Where such a waiver is relied upon as the basis for receiving in evidence an incriminating blood alcohol test result, the People will have to sustain a heavy burden to establish, beyond a reasonable doubt in the mind of the hearing court, that the consent/waiver was knowingly and voluntarily given — under the circumstances in which it was given.
The degree of difficulty this will usually entail is obvious from even momentary reflection on a typical fact pattern which might accompany such an evidentiary offer. The (by then) defendant would be depicted as a person, who was. *338 believed to be intoxicated (mildly to grossly), was injured (slightly to critically), was perhaps under some degree of sedation, and was enduring the additional stress of feeling responsible for the death/injury of others (from total strangers to close family members or friends); then the hearing court is asked to find (and believe) that the suspect’s affirmative nod — or even the solitary spoken “yes” — was meant to be the voluntary and “intentional relinquishment or abandonment of a known right or privilege” which the law requires (Johnson v Zerbst, 304 US 458, 464). What seems easy in the emergency room may prove to be most difficult in the courtroom.
3.) PURSUANT TO COURT ORDER
In the course of deciding Abe A. (56 NY2d 288, supra), the Court of Appeals came to the conclusion that the search warrant authority bestowed on courts of New York State under CPL article 690 was sufficiently broad to implicitly authorize courts to direct and authorize the intrusion (“search”) into a person’s body and the seizure of a sample of his blood providing certain conditions precedent were established to the satisfaction of the authorizing Judge.[3]
“[W]e hold a court order to obtain a blood sample of a suspect may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a ‘clear indication’ that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable. In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect’s constitutional right to be free from bodily intrusion on the other.” (Matter of Abe A., supra, p 291.)
Such a foundational trilogy would be relatively easy to establish in the type of vehicular homicide/assault cases *339 under discussion. It therefore seems reasonably safe to assume that when law enforcement personnel are faced with the problem under review, they could safely make application to an appropriate court for an order authorizing the withdrawal of a blood sample from a suspect, in much the same form and content as an application for a traditional search warrant.
The “appropriate court” would include any superior court Judge or a local criminal court Judge having geographic jurisdiction over the site of the accident under investigation, or the site of the emergency room where the blood sample is proposed to be withdrawn from the suspect (CPL 690.20, subd 1; People v Hickey, 40 NY2d 761).
Implicit in utilizing this procedure is the necessity that the police seek out and ñnd a willing Judge to consider their application (a somewhat unpleasant prospect for all concerned given the night hours when these cases invariably arise), but following this procedure would have the obvious advantage of a process which could be pursued much earlier than some of the others because it would not require any access by the police to the suspect (who could be under any of several forms of treatment or isolation) and would dispense with any later showing of consent on the part of the patient/suspect — and would assure the evidence even if he were to refuse.
Parenthetically, the medical and hospital personnel involved may react more favorably and co-operatively in drawing the blood sample if furnished with an authorizing court order, rather than to proceed (at their perceived peril) armed only with the assurance of the police officer that what they are doing “to” (not for) their patient is permitted by law because by driving a car he had consented that they take his blood and give it to the police to use against him.
I-B.) USING THE CHEMICAL ANALYSIS IN EVIDENCE
Even where the law enforcement personnel involved in investigations of this type have obtained a blood sample through one of the three means discussed, the prosecution’s legal troubles may yet not be behind them. In addition to the customary evidentiary foundation establishing the sci *340 entific legitimacy of the particular “blood alcohol” test, the qualifications of the person performing the test, and the integrity of the blood sample tested (see, e.g., People v Snyder, 90 AD2d 894), the Court of Appeals has apparently established a necessary nexus between the procedure used to obtain the particular sample and the criminal charge for which it is sought to be used as supportive evidence.
Kates (53 NY2d 591, supra) was a case where the Vehicle and Traffic Law procedure to obtain the blood was properly used, and the resulting chemical analysis evidence was offered in connection with an indictment which included Vehicle and Traffic Law charges (driving while intoxicated and driving under the influence): no problem.
However, the Third Department of the Appellate Division, in deciding Curran (90 AD2d 661, supra), would seem to have correctly analyzed the holdings of Abe A. (56 NY2d 288, supra) and Moselle (57 NY2d 97, supra), when it ruled that, while the blood sample had been properly obtained by a. police officer who followed the Vehicle and Traffic Law implied consent procedure (the defendant was unconscious), the analysis of the sample (showing .23 of one per centum of weight of alcohol) could not form the basis for a subsequent plea to a Penal Law charge (criminally negligent homicide), even where the indictment to which the defendant pleaded guilty had originally contained Vehicle and Traffic Law charges of driving while intoxicated, etc. (which charges, ironically, had been dismissed as a part of the plea bargain).
Implicit in the Curran court’s analysis is the requirement that analyses of blood samples obtained pursuant to Vehicle and Traffic Law implied consent procedures are admissible on Vehicle and Traffic Law charges only; whereas, in order to use such evidence on exclusively Penal Law charges, it will be necessary for the People to show compliance with one of the other two courses approved in Abe A. (supra) — express consent or a court order.
Unless and until this nexus requirement is modified by the Court of Appeals,[4] it will present perplexing problems *341 for trial courts and the trial Bar — of which the case at hand is such a problem.
Il) THE PARTICULAR CASE
Applying the foregoing recent judicial history and legal analysis to the case under review, it is the court’s determination that the blood sample obtained from the defendant at the Wilson Memorial Hospital emergency room shortly before/after 6:00 a.m., on July 29,1982, was obtained after compliance by Trooper Elwood with the requirements of section 1194 of the Vehicle and Traffic Law.
The court is satisfied that by the time he placed the defendant under arrest in the hospital emergency room “for driving while intoxicated”, Trooper Elwood had reasonable grounds to do so. Within an hour before the accident, he had observed the defendant in a bar; he knew that the defendant had been operating a vehicle; that he had been traveling in a southbound direction in the northbound lanes of a limited access, divided interstate highway, and that apparently he had been unable to control his car so as to avoid colliding with a tractor trailer. Additionally, from the odor he detected on the defendant’s breath, the officer knew that he had not only been at a place where alcoholic beverages were sold, but had been drinking himself (either there or somewhere else). The cumulative effect of such facts was to provide the officer with ample reason to make the arrest of the defendant which he made.
Having arrested the defendant, the subsequent effort to obtain his consent to the withdrawal of a blood sample is relatively unimportant in the Vehicle and Traffic Law context. Whether or not the defendant consented, after being asked to do so and advised of the effect of his refusal, there is no evidence offered to indicate that the defendant refused the test. Finally, it is stipulated (and circumstantially supported by the evidence in the record) that the sample was withdrawn within two hours from the time when Trooper Elwood placed the defendant under arrest. This procedure would, therefore, render the results of the *342 subsequent chemical analysis of the sample withdrawn from the defendant generally admissible at trial in connection with the second and third counts of the indictment charging him with violations of the stated subdivisions of section 1192 of the Vehicle and Traffic Law.
However, the indictment also contains a Penal Law charge (assault, second degree)[5] and the court reaches a contrary conclusion with respect to the admissibility of the blood alcohol test results as evidence of the defendant’s “reckless” conduct under that count.
Since no court order was sought or obtained for the withdrawal of the blood sample from the defendant, the only basis for its admissibility on this count would be that it was obtained with the defendant’s consent (Matter of Abe A., 56 NY2d 288, supra; People v Moselle, 57 NY2d 97, supra). The court cannot conclude from the evidence adduced at the hearing that the People established beyond a reasonable doubt that the defendant was in a physical or mental condition to knowingly and voluntarily appreciate the options available to him, the consequences of his choice, or the fact that he made one.
If the only charge or charges contained in the indictment against the defendant dealt with violations of section 1192 of the Vehicle and Traffic Law, the chemical test results would be clearly admissible. If the only charge or charges against him were for violations of the Penal Law, the test results would be just as clearly inadmissible.
The apparent legal and practical effect of this confluence of two divergent lines of appellate judicial authority would seem to require that the court permit the People to offer evidence of the results of the chemical analysis of the defendant’s blood (assuming a proper foundation as to the chain of custody of the sample, the competency of the tester and the legitimacy of the test), but that the defendant will be entitled to have the court instruct the trial jury that they may not consider the chemical test results in arriving at their determination as to whether or not the defendant *343 acted “recklessly” on the morning in question (as charged in the first count of the indictment).
The defendant’s trial would not be the first or last time when a trial court permits one of the parties, in the interest of fairness,[6] to present evidence for some legitimate purpose and then be required (also out of fairness) to “unring the bell” by adequately instructing the jurors that their consideration of what they have just heard is to be limited to one aspect of the case — and to be totally disregarded in considering some other aspect.
“It frequently happens that evidence is admissible for one purpose and is inadmissible for another purpose * * * As a general rule, if evidence is competent for one purpose, it is not excluded merely because of the danger that the jury may also consider it for another purpose for which it is incompetent. The party against whom the evidence is offered, however, is entitled upon request, and sometimes without request (see Criminal Procedure Law, § 60.35 (2)), to have the court instruct the jury that the evidence shall be considered only for the purpose for which it is competent.” (Richardson, Evidence [Prince, 10th ed], § 6, p 5.)
Therefore, the defendant’s motion to exclude, as a part of the People’s direct case, the results of the chemical analysis of the blood sample taken from him should be denied, insofar as that evidence is sought to be offered in support of the second and third counts of the indictment charging violations of section 1192 of the Vehicle and Traffic Law. However, the defendant’s motion to suppress should be granted with respect to the offering (or argument) of such evidence in support of the first count of the indictment charging a “reckless assault” under subdivision 4 of section 120.05 of the Penal Law.

. The defendant testified at the hearing and presented a textbook profile of the “traumatic amnesiac” who remembered nothing of the events immediately before, during or immediately after the accident. He recalled nothing from a point in time when he was with friends at the Twin Rivers Inn to a time when he found himself in a hospital room being comforted by his wife. His professed total lack of recall had one glaring exception, however. He attempted to persuade the court that he recalled “someone” at the hospital telling him to sign “something” which was “required before they could treat him” (apparently intimating that his proffered “consent” may have been less than knowingly or voluntarily given). Incredible.

. For many of the same reasons that resort to the “consent search” is preferred over the investment of the time and effort necessary to develop probable cause and to make application to a Judge for a search warrant.

. This basis for the authority of courts to issue orders authorizing the withdrawal of blood samples seems more appropriate than the apparent reliance of the Moselle court on the discovery provisions of the Criminal Procedure Law (240.40). As Judge Jasen points out in his dissenting opinion, the latter section requires, as a condition precedent, that there be some criminal proceeding already initiated against the suspect by means of the filing of an accusatory instrument, which is rarely the case in the prearrest emergency room situations under discussion. (People v Moselle, 57 NY2d 97.)

. Which may not involve too long a wait, since the Second Department in deciding Hall (91 AD2d 1002) has reached a contrary conclusion from the Third Department’s Curran decision by approving the receipt in evidence at the defendant’s criminally *341 negligent homicide trial (with no accompanying Vehicle and Traffic Law charges) of the results of the analysis of a blood sample taken with his “implied consent” (he, too, having been unconscious at the time).

. Such offenses being clearly joinable in a single indictment as being predicated “upon the same act or upon the same criminal transaction”. (CPL 200.20, subd 2, par [a].)

. A contrary ruling — to exclude the test result evidence entirely — would unduly prejudice the People. For instance, the third count of the indictment would have to be dismissed out of hand — even though, as determined above, Trooper Elwood had correctly followed the prescribed procedure in obtaining the blood sample on which that count is founded.