# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 62
The People &c.,
   Appellant,
  v.
Reginald Goldman,
   Respondent.

Robert C. McIver, for appellant.
Alexandra L. Mitter, for respondent.

DiFIORE, Chief Judge:

In *Matter of Abe A.* (56 NY2d 288 [1982]), we sanctioned the use of a search warrant pursuant to CPL article 690 for the seizure of corporeal evidence from an uncharged suspect. Since the seizure required a bodily intrusion, the Court, using a Fourth Amendment reasonableness analysis, set forth a three-prong standard, requiring the People to demonstrate probable cause to believe the individual committed the crime, a "clear indication" that material and relevant evidence will be found, and that the means of

- 1 -

obtaining the evidence is "safe and reliable."  We explained that, in balancing the need for a search warrant against any unwarranted intrusion, a court "must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other (*id.* at 291).  Generally, when the corporeal evidence sought is not subject to alteration or destruction, there is no exigency and the search warrant application must be brought on notice to the suspect (*see id.* at 295-296).  The primary issue presented by this appeal is whether *Abe A.* and the constitutional right against unreasonable search and seizure requires that, prior to a neutral magistrate's issuance of a search warrant to obtain DNA evidence from a suspect's body by buccal swab, a suspect must receive—in addition to notice and the opportunity to be heard—discovery as to the demonstration of the probable cause in the warrant application and an adversarial hearing.  We hold that there was no violation of any constitutional rights, as defendant, provided with an opportunity to be heard on the issuance of the warrant, directed no argument to the magistrate as to the reasonable nature of the bodily intrusion sought.

I.

Defendant was a member of Young Uptown Boys (YUB), a subset of a larger Bronx crew, Young Gunnaz (YG).  At 12:40 am on August 14, 2010, defendant and three other individuals drove into a rival crew's territory and defendant, exiting the front passenger seat of a vehicle, shot and killed the 16-year-old victim, who happened to be standing

outside a residential building. The shooting was captured on surveillance video, and depicted a gold Nissan Maxima, occupied by four individuals. The shooter's identity could not be determined from the surveillance footage. However, two days after the homicide, police located the driver of the vehicle, KG, who later became a cooperating witness and identified defendant as the shooter. KG's vehicle was seized and processed for DNA evidence. The Office of the Chief Medical Examiner (OCME) tested the evidence and generated DNA profiles, including an unknown profile from Male Donor A on a sample taken from the interior front passenger seat door handle and a mixture of DNA from the front passenger armrest handle. In the meantime, the police obtained surveillance footage from defendant's apartment building, recorded minutes after the shooting, corroborating KG's narrative that the four occupants of the gold Maxima went to the building after the shooting.

On January 31, 2012, the People sought a search warrant to obtain a saliva sample for DNA testing from defendant, who was in custody in Rikers Island on unrelated charges. The supporting affidavit, submitted by the investigating officer, alleged that, based on surveillance footage and information provided by known witnesses based on their direct knowledge, defendant was the shooter who exited the front passenger seat of the Maxima and killed the victim. The application sought an exemplar of defendant's DNA for comparison to the DNA profiles the lab generated from the samples taken from the front passenger area of the Maxima, as evidence of his commission of the murder. The affidavit alleged that a police officer would take the saliva sample and deliver it to OCME and,

citing to *Abe A.* and other case law, represented that the method of seizure is safe and reliable.

The People notified counsel who was representing defendant on the unrelated charges of the pending application and that attorney appeared at the hearing on defendant's behalf. At that time, the court noted that, although the People "elected to notify the defense counsel" of the search warrant application, "this is an ex-part[e] application." The court observed that during the proceeding the cooperating witness in this murder investigation would likely be identified on the record, making it "anomalous" that defense counsel would be present. Nonetheless, the court stated that it would "allow [defense counsel] to make your objection to the substantive issues."

Based on *Abe A.*, counsel argued that, where, as here, there is no exigency in the seizure of the DNA evidence, due process required that a suspect be given notice and an opportunity to challenge the search warrant "before his constitutional right to be let alone may be infringed." Notwithstanding the absence of an accusatory instrument, defense counsel also asserted that the discovery procedure under (former) CPL 240.40[1] should apply—and that he should be permitted to review the warrant application, even if it was only a redacted copy. Counsel directed no argument to either the safety, reliability, or

---

[1] CPL article 240, which set forth the obligations of the parties for discovery upon the filing of an accusatory instrument, has since been repealed (L 2019, ch 59, part LLL, § 1) and replaced by CPL article 245. CPL 240.40 allowed for a court order to seize corporeal evidence from a defendant, upon the People's motion with notice to the defendant. The procedure is now authorized in the current version of the nontestimonial discovery statute (CPL 245.40 [containing the language of *Abe A.*'s three-prong test])

physical discomfort of the method to be used to seize saliva through a buccal swab or that the swab would "put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained" (*Birchfield v North Dakota*, 579 US ___, 136 S Ct 2160, 2177 [2016]). The court then excluded counsel from the remainder of the hearing.

The court signed the search warrant, concluding that there was "probable cause and more" to believe that defendant committed the crime and was the source of the DNA profile in the vehicle. OCME analyzed defendant's exemplar, compared it to the profile of the primary donor from a mixture taken from the front passenger seat area of the Maxima and concluded that the profiles were the same. In March 2012, defendant was charged by indictment with two counts of murder in the second degree, manslaughter in the first degree and criminal possession of a weapon in the second degree.

Prior to trial, defendant moved to suppress the DNA evidence. He argued that the court refused to hear from his attorney on the issue of probable cause. Defendant, without the benefit of access to the search warrant application, made the conclusory assertion that the application failed to set forth probable cause that he committed the homicide and failed to articulate how the DNA profile related to the homicide investigation. Despite a second opportunity to do so, defendant directed no argument to the safety, reliability, or physical discomfort of the use of the buccal swab to obtain his DNA, the value of DNA comparative evidence or the adequacy of any applicable restrictions on the use of his DNA sample— instead, defendant contested only the "first[] and second requirements set forth in *Matter*

*of Abe A.*"   The court denied the suppression motion, adhering to its conclusion that probable cause had been established to support the issuance of the warrant.

At trial, the People sought to introduce a redacted version of a music video in which defendant appeared entitled, "Mobbin Out."   The video, which had been uploaded to YouTube on August 25, 2010, depicted defendant rapping about "run[ning] up" into a rival crew's "house" and was offered as probative of defendant's motive.   Defendant did not contest that he was the person depicted in the video, but argued that the video was inadmissible on the ground that it was not properly authenticated, as the People could not prove when it had been created.   The court held that the video was admissible, subject to connection with KG's testimony as to the timing of its creation.

KG testified about the murder, including details of defendant's participation.   He also related that defendant called him the morning after the shooting to declare that the victim was dead and to invite him to attend the filming of a video later that day.   KG did not attend the filming, but believed that the name of the video was "Mobbing Out."   He affirmed that the video in evidence accurately represented what he had previously viewed on YouTube and identified, from the video, defendant and the two rear-seat passengers who had been in the Maxima at the time of the shooting.   He also confirmed that a social media handle that appeared as text on the video was associated with defendant's nickname—J Smooth—as well as the name of defendant's crew (YUB).

Defendant was convicted, upon a jury verdict of manslaughter in the first degree. The jury acquitted defendant of second-degree murder.

The Appellate Division reversed, granted defendant's motion to suppress the DNA evidence and remanded for a new trial (171 AD3d 581 [1st Dept 2019]). The Court held that Supreme Court erred in precluding defense counsel from reviewing the search warrant application and in denying counsel the opportunity to be heard on the issue of probable cause. The Court rejected the People's argument that *Abe A.* requires notice only for the first level of intrusion—seizure of the person—and held that the due process requirement of notice and an opportunity to be heard is likewise required for the subsequent search and seizure of corporeal evidence. The Court also held that the People failed to adequately authenticate the YouTube video under *People v Price* (29 NY3d 472 [2017]). A Judge of this Court granted the People leave to appeal (33 NY3d 1069 [2019]), and we now reverse.

## II.

"The warrant requirement of the State and Federal Constitutions (NY Const, art I, § 12; US Const, 4th Amend) is designed to interpose the detached and independent judgment of a neutral Magistrate between the interested viewpoint of those engaged in ferreting out crime and potential encroachments on the sanctity and privacy of the individual" (*People v Hanlon*, 36 NY2d 549, 558 [1975], citing *Johnson v United States*, 333 US 10, 13-14 [1948]). Search warrant applications are usually based "on an ex parte application—by definition not litigated by the parties in the adversarial sense at all" (*People v Bilsky*, 95 NY2d 172, 176 [2000]; *see Heller v New York*, 413 US 483 [1973]). CPL article 690 codifies the constitutional requirements for a search warrant. Corporeal evidence, such as blood or DNA, is subject to seizure pursuant to the warrant if there is both reasonable cause

to believe that a person has committed an offense and that the specified evidence to be seized tends to demonstrate that the person committed that offense (*see* CPL 690.10 [4]). The neutral magistrate makes this probable cause determination as a matter of course. A defendant may later exercise the right to challenge a search warrant based on lack of probable cause through a pretrial suppression motion (*see* 95 NY2d at 177). "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner" (*Schmerber v California*, 384 US 757, 768 [1966]). In seizing corporeal evidence by a bodily intrusion, we must determine "whether the means and procedures employed in taking [the evidence] respected relevant Fourth Amendment standards of reasonableness" (*id.*).

In *Matter of Abe A.*, we addressed whether a court order to obtain a blood sample from an uncharged suspect in a murder investigation, for purposes of performing a blood typing test, was reasonable under the Fourth Amendment. We first concluded that a search warrant pursuant to CPL article 690 was the vehicle to compel a suspect to provide corporeal evidence, and then proceeded to address constitutional concerns arising from a seizure by way of a bodily intrusion. We held that, "Fourth Amendment safeguards should be seen as implicated at two discrete levels. These are, first, 'the "seizure" of the "person" necessary to bring him into contact with government agents' and, second, 'the subsequent search for and seizure of the evidence'" (56 NY2d at 295, quoting *United States v Dionisio*, 410 US 1, 8 [1973]). At the first level, a judicial determination of probable cause was

required for the initial seizure of the person, except in cases of exigency (*see* 56 NY2d at 295).  We observed that the procedure employed by the People in *Abe A.*, "bringing on its original application on notice to the suspect[,] was no more than is required by such circumstances," citing to cases where there was an adversarial hearing prior to the issuance of the order authorizing the corporeal search (56 NY2d at 296, citing *United States v Crowder*, 543 F2d 312, 316 [DC Cir 1976] [surgical removal of bullet]), although *Abe A.* itself involved a "routine" blood draw (56 NY2d at 299).  It was in that context that we observed, in the absence of exigency, "it is an elementary tenet of due process that the target of the application be afforded the opportunity to be heard in opposition before his or her constitutional right to be left alone may be infringed" (56 NY2d at 296).

As to the "second level of our Fourth Amendment inquiry" required when law enforcement presents the courts with a request for a bodily intrusion, we held that there must be a "clear indication that the intrusion will supply substantial probative evidence" but that facts establishing probable cause would likely establish the necessary relevance (56 NY2d at 297 [internal quotation marks omitted], citing *Schmerber*, 384 US at 770).[2]

---

[2] The "clear indication" that material and relevant evidence will be found is not a separate standard under the Fourth Amendment (*see United States v Montoya de Hernandez*, 473 US 531, 540-541 [1985]).  Rather, as used in *Schmerber*, it "indicate[s] the necessity for particularized suspicion that the evidence sought might be found within the body of the individual" (*id.* at 540).  Thus, there is some degree of overlap between the probable cause (CPL article 690) and "clear indication" standards.  Significantly, *Abe A.* predated the advent of DNA evidence.  Thus, unlike *Abe A.*, where it was not necessarily clear that a suspect's blood type would provide probative evidence identifying the perpetrator (*see People v Mountain*, 66 NY2d 197 [1985]), a determination of probable cause to compare DNA evidence of a suspect to a fully developed DNA profile obtained from a relevant crime scene would render the "clear indication" test in *Abe A.* academic.

"Next, the method by which the authorized intrusion is to be accomplished must be safe, reliable and impose no more physical discomfort than is reasonably necessary" and when "the body is to be invaded, the procedure should be carried out by a qualified physician in accordance with accepted medical standards" (56 NY2d at 297-298, citing *Schmerber*, 384 US at 771-772).  Finally, we directed the issuing court to consider the circumstances of the particular case, including the value of the potential evidence and alternative, less intrusive, means for obtaining it (56 NY2d at 298).

The fundamental Fourth Amendment constitutional protection of a search warrant predicated on probable cause was employed here, narrowing the issue to the crucial factor of the magnitude of the intrusive procedure sought and, on that issue, *Maryland v King* (569 US 435 [2013]) is significant.  There, the Court addressed whether it was unreasonable, in the absence of any exigency, to permit a warrantless buccal swab taken by law enforcement authorities for DNA analysis as part of a routine booking procedure pursuant to state law based on the defendant's arrest for a violent felony.  The Court noted that even a search for which a warrant is not required must be reasonable, particularly in the "scope and manner of execution" (569 US at 448).  The Court characterized the swabbing procedure as a "brief and [] minimal intrusion" that was "quick and painless" (569 US at 463, 444).  Where the defendant had been validly arrested based on probable cause, his "expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks," given the significant state interests in identifying him (*id.* at 465).  It further noted that the "buccal swab is a far more gentle process than a venipuncture to draw

blood" (the intrusion in *Abe A.*, which also required medical assistance) (*see id.* at 446, citing *Winston v Lee*, 470 US 753, 760 [1985]).  Plainly, then, *King* lays to rest any constitutional concern that the very nature of the bodily intrusion occasioned by a buccal swab would necessitate an *Abe A.* inquiry as to the procedure's safety, reliability and absence of physical discomfort.

Conversely, although an intrusion will typically be deemed reasonable once probable cause has been established, there are certain situations, such as surgery, that "implicate[] expectations of privacy and security of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of a crime" (*Winston*, 470 US at 759). To that end, *United States v Crowder*, which *Abe A.* cited for the proposition that a motion "on notice to the suspect was no more than is required" (56 NY2d at 296) dealt with a substantial bodily intrusion.  In *Crowder*, the court held an adversarial proceeding to determine whether the surgical removal of a bullet from the arm of a murder suspect was reasonable.  At that hearing, the court heard testimony from a physician, who opined on the risks of the surgery—including the location of the bullet, its proximity to any nerves in the individual's body and any potential lasting effects (543 F2d at 314).  That hearing was addressed largely, if not solely, to the issue of the potential risks posed by the surgery—a matter beyond the ken of the court and requiring expert medical testimony.  Under those circumstances, an adversarial fact-finding hearing on the subject of the manner and method of the intrusion is in keeping with *Abe A.*'s requirement of a pre-execution opportunity to be heard, as juxtaposed with the demonstration of basic probable cause in the warrant

application mandated by the constitution and CPL article 690. Indeed, the critical difference between an *Abe A.* application and the ordinary ex parte search warrant application, is the request for a bodily intrusion, which triggers the requirement of notice and an opportunity to be heard; a more invasive intrusion may require a fact-finding hearing as to the personal risks to the suspect if the seizure is authorized. There is no purpose for such a hearing if the reasonable and minimal nature of the bodily intrusion is well-established and the likelihood that the specified evidence seized in that intrusion possesses an acknowledged probative value, particularly in the context of comparative analysis.

*King* is also relevant to another important privacy interest that must be considered when corporeal evidence is sought. As noted, our decision in *Abe A.* predated the use of DNA evidence. The blood test at issue in that case "reveal[ed] only one bit of information"—blood type—and did not "put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained" (*Birchfield*, 579 US ___, 136 S Ct at 2177). As *King* explained, the DNA profile sought was developed pursuant to national standards from a particular noncoding region of the chromosomes, which, "while useful and even dispositive for purposes like identity, does not show more far-reaching and complex characteristics like genetic traits" (569 US at 443). In balancing the legitimate government interest at issue in *King* with the respondent's reasonable expectations of privacy, the Court emphasized that the Maryland statute at issue in the case permitted "law enforcement officers [to] analyze

DNA for the sole purpose of generating a unique identifying number against which future samples may be matched" and "provide[d] statutory protections that guard against further invasion of privacy" (569 US at 464-465). The Court noted that the statute required "that '[o]nly DNA records that directly relate[d] to the identification of individuals [could] be collected and stored.' No purpose other than identification [was] permissible: 'A person may not willfully test a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle'" (*id.* at 465, quoting Md Pub Saf Code Ann §§ 2-505 [b] [1]; 2-512 [c]). The Court explained that "a statutory or regulatory duty to avoid unwarranted disclosures generally allays . . . privacy concerns" (*id.* [internal quotation marks and citations omitted]).

In that regard, we note that the Executive Law demands an accredited state laboratory conform to the national DNA index system in developing the DNA profile from limited loci and imposes a similar duty to maintain the confidentiality of the results of DNA testing to avoid unwarranted disclosures (*see* Executive Law §§ 995-c; 995-d; 12 NYCRR 6192.3 [b]; s*ee also Matter of Samy F. v Fabrizio*, 176 AD3d 44, 47 [1st Dept 2019]). Assuming the applicability of those significant statutory safeguards, there is no need for an adversarial hearing to determine whether the collection of a DNA sample amounts to an unreasonable invasion of privacy in a particular case.

The People, of course, always bear the burden of establishing probable cause that defendant committed an offense and that the evidence sought tends to demonstrate defendant's commission of the offense—the burden applicable to any ex parte application

for a search warrant. Probable cause is reviewed by the neutral magistrate without the need for an adversarial hearing. Consequently, *Abe A.* should not be interpreted as creating a mandatory discovery procedure affording defendant access to the supporting affidavit demonstrating the requisite probable cause set forth in CPL article 690, as a matter of constitutional law (*see People v Castillo*, 80 NY2d 578, 584 [1992]; *People v Liberatore*, 79 NY2d 208, 216 [1992]). This is not to say that a court may not use its discretion to grant discovery in an *Abe A.* application in conducting the reasonableness analysis as to probable cause, after balancing "the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other" (56 NY2d at 291), but access to that information must first depend on the magnitude of the bodily intrusion sought by the warrant (*see King*, 569 US at 464; *Crowder*, 543 F2d 312, 316).

It is evident that *Abe A.*'s requirement of notice and an opportunity to be heard in the pre-execution stage of a warrant authorizing the seizure of evidence by bodily intrusion was satisfied in this case. Defense counsel, having received notice of the hearing on the warrant, was given an opportunity to be heard on the application, other than on the issue of probable cause. Counsel failed to direct any argument to the nature of the intrusion, the value of comparative DNA analysis evidence or the sufficiency of the safeguards preventing unwarranted disclosure of the results of his DNA testing, either at the hearing or in his motion to suppress. Given that "the utility of DNA identification in the criminal

justice system is already undisputed" (569 US at 442), defendant could not mount a credible claim that the DNA evidence was unlikely to provide material evidence. The buccal swab—now a simple and common method for securing a convicted defendant's DNA for inclusion in a computerized identification index (*see* Executive Law § 995-c)— is undeniably safe, consists of a minimal intrusion and involves no discomfort. The constitutional role of the neutral magistrate to determine whether probable cause of defendant's commission of the crime and the factual basis for the DNA comparative evidence set forth in the warrant application required no supplemental adversarial process. Thus, the method and procedures employed in taking the saliva undoubtedly respected relevant Fourth Amendment standards of reasonableness, and defendant's claim that the failure to provide him discovery of the extant probable cause and an adversarial hearing nonetheless warrants the invocation of the exclusionary rule is without constitutional basis.

Since defendant received notice and an opportunity to be heard on the nature of the bodily intrusion to be authorized by, and the evidence to be collected under, the warrant in this case, it is not necessary to address the People's arguments that *Abe A.*'s notice procedure preceding the issuance of a search warrant is no longer required for the minimal intrusion occasioned by a buccal swab or that the notice procedure does not apply to a suspect who is in custody. Supreme Court properly denied the motion to suppress the DNA evidence.

III.

The Appellate Division also concluded that the YouTube video was not properly authenticated under any of the methods cited in *People v Price*. In that case, the People sought to introduce a still photograph they found on an Internet profile page, which showed the defendant holding a gun, for the purpose of proving that it was the same gun he allegedly used in the charged robbery. Since the People failed to meet their own proposed burden of proof—the witness failed to identify the gun as the one used in the robbery and there was insufficient evidence to establish that the defendant controlled the webpage on which the photo was posted—we held that the photo should not have been admitted due to the absence of a proper foundation (29 NY3d at 480). However, we also recognized that "'[t]he foundation necessary to establish [authenticity] may differ according to the nature of the evidence sought to be admitted'" (29 NY3d at 476, quoting *People v McGee*, 49 NY2d 48, 59 [1979]).

In the circumstances presented, the YouTube video was sufficiently authenticated to demonstrate that the video "'accurately represent[ed] the subject matter depicted'" (29 NY3d at 477, quoting *People v Byrnes*, 33 NY2d 343, 347 [1974]). The moving picture evidence at issue here is distinguishable in several respects from the still photograph at issue in *Price*. In addition to the significant fact that defendant did not dispute that he was the individual who appeared in the video reciting certain words, the video contains distinctive identifying characteristics—particularly, it depicts defendant and two of the other individuals who were in the Maxima during the shooting in similar attire to what they were wearing on the night of the homicide and the background demonstrated that it was

evidently filmed in defendant's neighborhood.  KG's testimony also provided evidence pertinent to the timing of the making of the video—including defendant's admission of his future intent to make the video the next morning (*see People v James*, 93 NY2d 620, 630 [1999])—and the video was uploaded to YouTube close in time to the homicide.  In addition, the video was introduced for its relevance to defendant's motive related to territorial gang activity—which is not an element of the offense—rather than specifically offered for its truth.  This case is very similar to *United States v Pettway* (2018 WL 4958962, 2018 US Dist LEXIS 176848 [WD NY, Oct 15, 2018]), wherein the court addressed the authentication of a YouTube video depicting the defendant, who did not dispute that he was the man depicted in the video, rapping about conduct similar to that involved in the crime.  Under the circumstances, the court concluded that a witness's testimony as to the source of the video and how it was discovered, and identifying the defendant as the person depicted, was sufficient to allow the jury to conclude that the video was what the government claimed it to be (*Pettway*, 2018 WL 4958962, *6, 2018 US Dist LEXIS 176848, *19; *see also United States v Washington*, 2017 WL 3642112, 2017 US Dist LEXIS 136220 [ND Ill, E Div, Aug 24, 2017]).

In light of its holding, the Appellate Division did not address defendant's argument that the trial court abused its discretion in determining that the video's probative value outweighed its potential for prejudice (*see People v Brewer*, 28 NY3d 271, 277 [2016]).

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress denied, and the case remitted to the Appellate Division for determination of the facts and issues raised but not determined on appeal to that Court.

FAHEY, J. (concurring in result):

I share the view of the majority, detailed in section II of its opinion, that *Matter of Abe A.* (56 NY2d 288 [1982]) and the constitutional right to be free from unreasonable searches and seizures do not "require[] that, prior to a neutral magistrate's issuance of a

- 1 -

search warrant to obtain DNA evidence from a suspect's body by buccal swab, [the] suspect must receive . . . discovery as to the demonstration of the probable cause in the warrant application and an adversarial hearing" (majority op at 2). Consequently, I agree with the majority that "Supreme Court properly denied the motion to suppress the DNA evidence" (*id.* at 15).

I also agree with my dissenting colleagues to the extent they conclude in section III of their writing that the YouTube video central to this matter should not have been admitted into evidence because it was not properly authenticated (*see* dissenting op at 30-31). Applying "the traditional test for authentication to [this] digital [recording] taken from a social media website" (*id.* at 30), I agree with the dissenters that the jury should not have seen the video because "[t]here was [neither] testimony from anyone involved in the video's creation, nor was there any expert testimony as to the video's unaltered state" (*id.* at 31; *see generally People v Price*, 29 NY3d 472, 480 [2017]).

Ultimately, however, I concur in the result because, in my view, the error in admitting the YouTube video into evidence is harmless (*see generally People v Crimmins*, 36 NY2d 230, 241-242 [1975]). The DNA evidence placed defendant in the automobile used to transport the shooter to and from the crime scene, defendant was identified as the shooter by the driver of that vehicle, and surveillance footage from the apartment building in which defendant lived confirmed the narrative of events described by that cooperating witness at trial.

RIVERA, J. (dissenting):

"One of the greatest contributions of American law may be the protection it affords the individual against the power of the government itself" (*Matter of Abe A.*, 56 NY2d 288, 290 [1982]). That protection extends to the individual's "constitutional right to be free from

- 1 -

bodily intrusion" by the government (*id.* at 291). "[I]t is an elementary tenet of due process" that the target of a government search and seizure must ordinarily receive notice and "be afforded the opportunity to be heard in opposition before [their] constitutional right to be left alone may be infringed" (*id.* at 296).

Under the majority's reasoning, in the ordinary course, a government official may request, unchallenged and in secret, a warrant to excise bodily material from a person not charged with any wrongdoing but suspected of a crime—not because of exigent circumstances but because the proposed method of extraction is minimally intrusive (majority op at 12). Constitutional safeguards prevent the type of routinization of government intrusion sanctioned by the majority.

As a bulwark against governmental abuse of authority, "[t]he notice due process requires [under both the United States and New York State constitutions] is notice reasonably calculated, under all of the circumstances, to apprise the interested parties of the pendency of the action and afford them an opportunity to present their objections" (*People v Ramos*, 85 NY2d 678, 683-684 [1995]). Issuance of the warrant to collect a sample of defendant Reginald Goldman's DNA violated his constitutional rights to due process by denying counsel an opportunity to review the warrant application and argue at an evidentiary hearing beforehand against the proposed bodily intrusion (*see Abe A.*, 56 NY2d at 296). Apart from this constitutional violation, there is also the matter of the trial court's erroneous admission of a redacted music video, despite a lack of authenticating evidence that the video is genuine and unaltered (*People v McGee*, 49 NY2d 48, 59 [1979]).

There is no need to remit for further review, as the Appellate Division properly concluded that either error requires reversal of the conviction and a new trial. I dissent.

I.

Counsel's Exclusion from the Evidentiary Hearing on the Warrant Application

According to the prosecutor's theory of its case against defendant Reginald Goldman, defendant was a member of a gang-like "crew" who went looking to scare people with his gun and fatally shot an innocent victim in a neighborhood controlled by a rival crew. As described at trial, the shooting tracked familiar gang behavior: defendant and three others were driving around when defendant directed the driver of the car to stop across from a small group, he then leaned out and away from the car, shouted his crew's initials, and shot at an individual on the street.

The prosecution turned on the testimony of KG, the vehicle driver and the only person to identify defendant as the shooter. Initially, KG named someone other than defendant. Five months later, represented by counsel and having negotiated a cooperation agreement whereby the prosecutor would recommend a noncustodial sentence in exchange for his testimony against defendant, KG recanted and said defendant shot the victim.

An investigating detective applied for a search warrant to obtain a saliva sample from defendant. The detective intended to compare DNA from the saliva sample to DNA collected from KG's car. At the time, defendant was represented by counsel and in custody on an unrelated and unresolved matter. An assistant district attorney gave defendant's counsel notice of the request without providing the warrant application. At the warrant

hearing, the court permitted counsel to make a short statement but excluded him from the

substantive evidentiary portion of the hearing and refused counsel's request to review the

application's contents.

In response to counsel's arguments that, under existing case law, including this

Court's decision in *Abe A.*, defendant was entitled to notice and an opportunity to be heard

on the merits, the court stated that search warrant applications are generally ex parte and

that *Abe A.* only requires notice and opportunity to be heard before a defendant is taken

into custody. The court held that *Abe A.*'s protections did not apply before the actual search

and seizure of bodily evidence from a defendant. As such, the requirement is inapplicable

when, as here, the defendant is already in custody. The court further noted that defendant

could controvert the warrant at a later time, but he could not contest the warrant prior to its

issuance. The court viewed this as a key distinction between an application for a search

warrant against an uncharged individual and the requirements of CPL 240, which permits

the taking of bodily evidence from someone charged with a crime, upon motion on notice.[1]

At the hearing, the following colloquy took place:

> "THE COURT: This is in the matter of an application for a
> search warrant . . . authorizing the seizure of a DNA sample
> from Reginald Goldman. [T]he district attorney . . . has[,] for
> reasons that I don't fully understand, elected to notify the

---

[1] That provision of the Criminal Procedure Law authorized the prosecution to obtain an order "[p]ermit[ting] the taking of samples of blood, hair or other materials from [a defendant's] body in a manner not involving an unreasonable intrusion thereof or a risk of serious physical injury thereto" but only if "an indictment, superior court information, prosecutor's information, information, or simplified information charging a misdemeanor is pending" and only by motion on notice to the defendant. (CPL 240.40 [2] [b] [v]).

defense counsel of her intent to make this application. It is my view she has no obligation to notify defense counsel about an application for a search warrant as this is an ex-part[e] application. Furthermore, in light of the fact that it is likely the confidential information will either be present on the affidavit or elicited on this record, it is further anomalous to me that the defense counsel is invited to be present and believes that he has a right to be present. At this point I don't believe that he has a right to be present, but . . . I will allow him to appear in the following limited manner  . . . . I assume that at this point has he seen this application?

"[ASSISTANT DISTRICT ATTORNEY]: No. And I don't wish that he does.

"THE COURT: All right. He's not entitled to see the application because as I said, it's ex-part[e], but he is here and he was invited to be here and for that reason, I will allow him a short statement in advance of the application. . . .

"[COUNSEL]: Thank you, your Honor . . . . I represent Mr. Goldman . . . on [matters unrelated to this investigation] . . . . Your Honor, it's my position that . . . such an application . . . should be on notice to counsel . . . .

"THE COURT: . . . The fact is that search warrants, at least the way they've been applied for in my thirty years doing judicial work, have always been ex-part[e], but you're here and I've given you the opportunity to speak on the record. So it's beside the point whether you agree or disagree with the ex-part[e] nature of the application . . . .

"[COUNSEL]: For the record, I disagree with the Court's ruling.

"THE COURT: I haven't made a ruling yet, but why don't you anticipate the ruling and make your record.

"[COUNSEL]: . . . I cite the Court to *People v Latibeaudierre*, 174 Misc 2d 60 [1997] [Queens County, Rotker, J.] a case very similar to the facts here, [where] the People initially sought . . . to compel the defendant who had a case pending . . . to submit a blood sample on an unrelated investigation . . . . [A]fter . . .

[an] off the record colloquy, the People withdrew [the CPL 240.40 (2) (b)] motion . . . and then sought an ex-part[e] search warrant application much like the People are seeking here, except that in that case they didn't notify defense counsel and a motion was later brought to challenge the search warrant application and Judge Rotker held that . . . the search warrant application did have to be on notice to counsel. . . .

"THE COURT: . . . [Y]ou're arguing the point that I have disagreed with you. . . . [Y]ou correctly cited [CPL 240.40]. That is available in all circumstances by statute to allow for an application for a saliva sample or other types of DNA sampling, and in my judgment, essentially replaces the need for a search warrant which preceded, as common law requirement, preceded the existence of that statute. Furthermore, the notice requirement under the statute is implicit because it is by motion. Third, there's nothing in the provisions of the statute that change the right of the People to go by a search warrant if they should wish. Fourth, there's nothing in the nature of this application that mandates that a search warrant be on notice when by its nature it is not on notice. And fifth . . . *Matter of Abe A*., 56 NY2d 288 . . . makes a distinction between a seizure of a person necessary to bring them in contact with the government and then the subsequent search or seizure for the evidence. And that's at page 295 and, in fact, I will quote from that, [']turning then to the constitutional issues which confront us on this appeal, Fourth Amendment safeguards should be seen as implicated at two discre[te] levels. These are, first, the seizure of the person necessary to bring them in contact with government agents, and second, subsequent search and seizure of evidence.['] The application of the notice requirement that you're relying on in a search warrant context appears to this Court to be the one in which . . . the party to the seizure is not currently in custody. And that's the first of the seizures that are addressed by the *Abe* Court in that paragraph. Had your client not been in custody as he is, then in order to obtain your client's presence, it would have been appropriate for the People to notify you in order to satisfy the requirements of the Constitution and I think that's what the *Abe* case acknowledges, when your client is not in custody you're entitled to notice. However, this case does not have a first stage seizure. That's because your client is in custody, and therefore, notice to you is totally unnecessary to

bring him constitutionally before this Court or before any other body that this Court orders and I do not believe that the *Abe* Court addresses that situation as one in which notice to you is required. . . . So you have an exception to my ruling . . . . [T]he actual standard for both are identical. That is probable cause. And furthermore, although the procedures are different, your rights are still insured. You have the right with respect to a search warrant to controvert the warrant. . . . [T]he search warrant procedures were in effect long before [CPL 240.40] was enacted and although I prefer [CPL 240.40], and I have no general objection to your knowing that this is going to be done, you have to understand that there might be instances in which an application for a DNA sample is based on matters that cannot be fully revealed because there's issues of security, issues of privacy issues that would endanger an individual and in those instances, it might just be that the search warrant procedure which can be more fully protected with redactions is more appropriate. Furthermore, it is my understanding that a [CPL 240.40] application still can be put through with a redacted application if there are confidential facts that are necessary to establish the basis for the search. . . . My understanding is that certain material that has been put in this is confidential at this time and can't be revealed.

"[COUNSEL]: I would ask for a redacted copy. The Court deems that the notice requirement isn't really applicable here, but I would argue that it is applicable and that notice would include allowing me to see the search warrant application.

"THE COURT: At some point you can because . . . you will have the right to controvert the warrant. . . . At some point not too far and it might be a redacted or maybe a full version depending on the circumstances here, but you do still have the right to controvert. In my judgment you don't have the right to do that before the warrant is issued. Again, because I believe this to be fundamentally an ex-part[e] proceeding, and properly so. . . ."

The court proceeded with the hearing outside of counsel's presence. The detective applicant was the sole witness and testified that he sought to obtain a saliva sample from defendant in order to compare it to DNA material he had collected from a vehicle believed

to be involved in the shooting. He also testified that he had reviewed video surveillance footage of the shooting as well as information provided by "civilian witnesses" that conformed to what he had observed in the surveillance footage. The court concluded that the detective did not need to disclose any information regarding the witnesses' identities as civilian witnesses are presumptively credible. The detective further testified that one of these unidentified witnesses placed defendant in the front passenger seat of the vehicle during the shooting. The court found probable cause to grant the application.

A cheek swab saliva sample of defendant's DNA was then analyzed and compared against the DNA on the front passenger interior door and armrest handles of KG's car, revealing a match. The judge who granted the search warrant application denied defendant's subsequent motion to suppress his DNA evidence, again concluding probable cause existed for the search. At trial the court admitted testimony that defendant's DNA matched DNA from the interior front passenger door handle of KG's car.

## II.

The first question presented in this appeal, and elided by the majority, is whether a court may issue a warrant to obtain bodily material from a person held in custody on an unrelated matter without affording that person the opportunity to challenge the warrant upon proper notice of the basis for the government's request. Until today's holding, our precedent was clear that, absent an exigency, such as a suspect's possible flight or the destruction of evidence, a suspect gets the chance to argue the merits of why the warrant

should not issue. And for good reason. The right to speak out against government bodily intrusion—before that intrusion occurs—is manifest in a civilized society.

A.

<u>Constitutional Safeguards Adopted in Matter of Abe A. to Protect Against Unlawful</u>

<u>Government Bodily Intrusions of Suspects</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" (US Const 4th Amend; *see also* NY Const, art I, § 12).[2] The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials" (*Camara v Municipal Court of City and County of San Francisco*, 387 US 523, 528 [1967]). Searches "involv[ing] a compelled physical intrusion" constitute "an invasion of bodily integrity" which "implicates an individual's 'most personal and deep-rooted expectations of privacy'" under the Fourth Amendment (*Missouri v McNeely*, 569 US 141, 148 [2013] quoting *Winston v Lee*, 470 US 753, 760 [1985]; *see also Schmerber v California*, 384 US 757, 769-770 [1966]; *Abe A.*, 56 NY2d at 295). These Fourth Amendment protections extend to those in state custody (*see People v Whitaker*, 64 NY2d 347, 351 [1985] ["(A) person does not lose all 4th Amendment rights once he has been lawfully incarcerated"]).

---

[2] Although the language of the Fourth Amendment and article I, Section 12 of New York's Constitution is identical, "this Court ha[s] not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution" (*People v Hinshaw*, No 46, 2020 WL 5127015, at *2 [NY Sept 1, 2020]).

In *Abe A.*, our Court recognized that the core constitutional due process safeguards of notice and an opportunity to be heard apply prior to a potential infringement of the right to be left alone by the State's request to extract corporeal evidence (56 NY2d at 296). In that case, the prosecution sought an order compelling an unindicted suspect in a homicide to provide a blood sample. Initially, the prosecution requested that the suspect voluntarily provide the sample, which he repeatedly refused to do. In light of the suspect's unwillingness to comply, the prosecution sought, on notice, a judicial order compelling him to provide the sample. The court granted the order, expressly finding that there was probable cause that the suspect committed the murder, that the evidence sought was clearly probative, and that the bodily intrusion would be slight. The suspect again refused to comply, and the prosecution sought a contempt order, which the court granted. The Appellate Division reversed and dismissed the order compelling the suspect to provide a blood sample, holding that, as the suspect had not yet been indicted, the contempt order ran afoul of the Fourth Amendment (*Matter of Abromowitz*, 81 AD2d 362, 369 [1981]).

Our Court reversed the Appellate Division, adopting an integrated analytic framework entailing a "multifaceted" inquiry. Under that framework,

> "a court order to obtain a [sample of a suspect's bodily material] may issue provided the People establish (1) probable cause to believe the suspect has committed the crime, (2) a 'clear indication' that relevant material evidence will be found, and (3) the method used to secure it is safe and reliable. In addition, the issuing court must weigh the seriousness of the crime, the importance of the evidence to the investigation and the unavailability of less intrusive means of obtaining it, on the one hand, against concern for the suspect's constitutional right to be free from bodily intrusion on the other"

(*id.* at 291). "Only if this stringent standard is met . . . may the intrusion be sustained" (*id.*).

In reasoning through the constitutional issues presented in *Abe A.*, this Court relied on *United States v Dionisio*, which reaffirmed that "the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels" (410 US 1, 8 [1973]). "These are, first, 'the 'seizure' of the 'person' necessary to bring [the person] into contact with government agents' and, second, 'the subsequent search for and seizure of the evidence'" (*Abe A.*, 56 NY2d at 295, quoting *Dionisio*, 410 US at 8). "Each deserves separate analysis" (*id.*).

As to the first-level seizure of the person, the Court explained that, absent an exigency, a finding of probable cause is required. The Court further opined that, under the federal and state constitutions, "when the physical evidence whose possession is the *raison d'etre* for detaining a person cannot be altered or destroyed, . . . by definition there can be no exigency to justify exemption from the warrant standard of probable cause" (*id.* at 296, citing US Const 4th, 14th Amends; NY Const, art I, § 12). In explaining the need for a judicial finding of probable cause in advance of issuing a search warrant, the Court further stated that, because there was no exigency in *Abe A.*, the original application in that case was properly brought on notice to the suspect. "After all, when frustration of the purpose of the application is not at risk, it is an elementary tenet of due process that the target of the application be afforded the opportunity to be heard in opposition before [the person's]

constitutional right to be left alone may be infringed" (*Abe. A*, 56 NY2d at 296 [citation omitted]).[3]

As this passage makes clear, the Court recognized that the right to be left alone does not solely encompass the right not to be stopped and seized but also includes the "right to be free from bodily intrusion" by the government (*id.* at 291; *cf. Union Pac. R. Co. v Botsford*, 141 US 250, 251 [1891] ["No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law . . . . The right to one's person may be said to be a right of complete immunity; to be let alone"] [internal quotation omitted]). In the simplest terms, the Court acknowledged the rule that, if the intended purpose of the search—obtaining bodily materials—is not at risk through the suspect's flight or imminent destruction of the evidence, then due process requires notice and an opportunity for a hearing.

The analysis of the seizure of a person dovetailed with the Court's discussion of the search for and seizure of a person's bodily material—the second level of analysis. At that level, additional safeguards are necessary to protect the individual against a government

---

[3] Moreover, this holding flatly rejected the argument, pressed by the prosecution in its briefing to the Court in *Abe A.*, that an adversarial hearing exceeded what due process required (*compare* brief for appellants in *Abe A.*, 56 NY2d 288 [1982] at 13 [arguing that the warrant court "went further than constitutionally required by issuing the order only after a full adversarial proceeding in which respondent and his counsel had an opportunity to challenge the sufficiency of the factual showing in advance"] *with Abe A.*, 56 NY2d at 297 ["At this point it seems appropriate to add, since here there was no exigency, that the course followed by the People in bringing on its original application on notice to the suspect was no more than is required by such circumstances"]).

"fishing expedition" for evidence, and the use of unsafe, unreliable methods of compelled

bodily intrusion (*Abe A.*, 56 NY2d at 297).

B.

*Abe A.* Applies to Persons in Custody at the Time of the Warrant Application

As a constitutional matter, a person not charged with but suspected of a crime who

is incarcerated on an unrelated matter faces the same threat of an unlawful seizure of bodily

material as an uncharged suspect at liberty. *Abe A.*'s constitutional safeguards apply

because of the nature of the request—intrusion into the body to collect corporeal

evidence—not because a defendant is at liberty (*see* 56 NY2d at 291, 297).

The text of *Abe A.* does not support a different conclusion. In *Abe A*, the Court cited

*Matter of Barber v Rubin*, a then-two-year-old Appellate Division decision which ordered

a pre-search hearing (*Abe. A*, 56 NY2d at 296 citing *Matter of Barber v Rubin*, 72 AD2d

347, 352 [2d Dept 1980]). In *Barber*, a defendant moved to prohibit the enforcement of a

trial court order permitting the extraction of hairs from his head. The defendant argued that

"the order, having been granted without a hearing, . . . violated [his] constitutional rights

of due process and his protection against unreasonable searches and seizures under the

State and Federal Constitutions" (72 AD2d at 349). In response, the Appellate Division

ordered an evidentiary hearing to "prob[e] the necessity of the procedure . . . , the probative

value of the evidence sought, the degree of invasion into the petitioner's body, and the

harm to which he might be exposed" (*id.* at 349). The Court further noted that it was not

deciding whether the federal constitution required appellate review prior to submission to

the blood test at issue in *Abe A.* because the vehicle for review employed in the case (appeal from conditional contempt) or an article 78 proceeding both provided pre-intrusion review and were therefore "constitutionally adequate substitute[s]" (*id.* at 294 n3). In other words, the constitutional safeguards are preemptive.

If *Abe A.* meant something other than what it says, the law would trivialize the sanctity of the human body. For example, a person at liberty would have the right to challenge a seizure in advance but not the purpose of the seizure, and a person in custody would have no right to challenge either—but in both cases, the government's seizure of bodily material is precisely what the individual seeks to avoid. Whether at liberty or in custody, the individual's challenge is founded on society's recognition that bodily intrusion by the government is prohibited except when certain "stringent standard[s] [are] met" (*id.* at 291). Individual rights against unlawful bodily intrusion can only be protected prior to the government's seizure of bodily materials. The majority's interpretation of *Abe A.* countenances invasions of a person's body without an ability to contest the probable cause for the invasion in advance, other than, apparently, to challenge the nature of a particularly grievous intrusion (majority op at 10-11).

Contrary to the majority's adoption of the prosecution's argument, a suppression hearing is not a safeguard against this sort of unlawful government action (*id.* at 8). Such a hearing only provides relief from admission at trial of the material collected; it does not protect against the unlawful search of the person and provides no recourse to someone who

is never charged with a crime. Only a pre-search hearing complies with due process as to the search itself.

The prosecution's argument that post-intrusion civil remedies are available for an alleged unlawful deprivation also misses the mark. Those remedies suffer from the same inadequacy as a motion to suppress—none prevent a possible constitutional violation, as they are triggered *after* the government intrusion into the body. They are remedies for a constitutional deprivation, not a safeguard against an unlawful taking of bodily material. They certainly do not protect individuals whom the government never charges. And yet, "the sole group for whom the Fourth Amendment's protections ought to be most jealously guarded [are] people who are innocent of the State's accusations" (*Maryland v King*, 569 US 435, 482 [1958] [Scalia, J., dissenting]). Moreover, successfully pursuing such remedies may be an impossibility for vast numbers of individuals whose DNA has been collected, particularly those who are low-income (*see* Michael T. Risher, "Racial Disparities in Databanking of DNA Profiles" in *Race and the Genetic Revolution: Science, Myth, and Culture*, 51 [Sheldon Krimsky & Kathleen Sloan, eds 2011] ["(F)ew arrestees, no matter how innocent, will be likely ever to return to court to wade through the process of getting their samples and profiles removed. This is particularly true for those without the resources to hire a lawyer to assist them"]; Julie Samuels et al., *Collecting DNA From Arrestees: Implementation Lessons*, 270 Natl. Inst. Just. J. 18, 23 ["(O)ur interviews with state crime laboratories suggest that when individuals bear the burden of initiating the expungement process, very few expungements actually occur and profiles are retained of

individuals who were never formally charged with a qualifying offense or whose case resulted in acquittal or dismissal"]).

## C.

## *Abe A.*'s Workable Safeguards Apply to All Seizures of Bodily Evidence

According to the majority, a pre-intrusion, adversarial fact-finding hearing is necessary only where the safety of the bodily intrusion is at issue, meaning only when the intrusion is so "extreme" in nature that it is unreasonable, notwithstanding the finding of probable cause. As the argument goes, because the buccal swab at issue here is a "brief and [] minimal intrusion" (majority op at 10), defendant was not entitled to a hearing to challenge this method of extraction.

The majority's attempt to draw a distinction between an ex parte warrant hearing and the procedure required by *Abe A.* based on this minimal-versus-extreme intrusion was implicitly rejected by the *Abe A.* Court. In fact, the Court described the blood draw at issue there as "hardly less routine than taking one's temperature" (56 NY2d at 299), and yet adopted the very analysis for that type of extraction eschewed here by the majority.

Because *Abe A.* does not support the majority's intended outcome, the majority turns to the United States Supreme Court's decision in *King* (569 US at 466) for support. Neither the prosecution nor defendant, nor any judge to have considered defendant's case, has so much as mentioned *King*. That is unsurprising, as *King* does not shed light on the real issue presented in this appeal, i.e., whether defendant should have received notice and

opportunity to be heard at an adversarial proceeding on the warrant request to extract his bodily material (the same procedure sanctioned by this Court in *Abe A.*). *King* was concerned with the constitutionality of Maryland's routine, warrantless collection of arrestees' DNA, a scheme New York has not adopted (*see* Executive Law § 995-c [3] [a] [permitting routine collection of DNA only "subsequent to conviction and sentencing"]). Indeed, the decision turned on the privacy interests of arrestees, but *Abe A.* concerns the rights of a suspect—a person who has not been arrested on probable cause of having committed the crime that underlies the warrant application.

That a prosecutor might easily meet the burden of showing that buccal swabs are safe and reliable only means that *Abe A.* is workable (majority op at 9 n 2). As noted in *Abe A.*, "most often facts which would establish probable cause will also tend to establish the high degree of relevance the nontestimonial evidence sought would have" (56 NY2d at 297 [internal citation omitted]).

Contrary to the majority's suggestion, collecting an individual's DNA via buccal swab is not a trivial event. A bodily intrusion is no less constitutionally significant because it is uncomfortable rather than painful, or because it can be accomplished by a nonphysician. Indeed, *Abe A.* requires that the manner of seizing bodily evidence be the least intrusive means possible. Ease of removal alone, then, does not dictate the legal analysis (*see e.g. Abe A.*, 56 NY2d at 299 [stating that due process protections are warranted even for the taking of blood which is "hardly less routine than taking one's temperature"]; *Barber*, 72 AD2d at 352-353 [holding that the State must satisfy due process

concerns before a suspect's "right to be left alone" may be infringed, even when infringement entails mere extraction of strands of hair]; *cf. Arizona v Hicks*, 480 US 321, 325 [1987] [holding that moving an object a few inches nonetheless constitutes a search and "is much more than trivial for purposes of the Fourth Amendment" because "(a) search is a search"]).

The United States Supreme Court has recognized that the taking of blood and skin samples, even when easily extracted without surgical assistance, "constitute[] the type of 'severe, though brief, intrusion upon cherished personal security' that is subject to constitutional scrutiny" (*Cupp v Murphy*, 412 US 291, 295 [1973] quoting *Terry v Ohio*, 392 US 1, 24-25 [1968]; *see also King*, 569 US at 446 [quoting *Cupp* for the proposition that using a buccal swab to obtain DNA samples is a search under the Fourth Amendment]). "[S]earches involving intrusions beyond the body's surface" implicate "[t]he interests in human dignity and privacy which the Fourth Amendment protects" (*Schmerber*, 384 US at 769-770; *see also Winston v Lee*, 470 US 753, 760 [1985] [bodily intrusions implicate the "most personal and deep-rooted expectations of privacy"]; *McNeely*, 569 US at 148 [holding that "a compelled physical intrusion" to obtain bodily evidence is "an invasion of bodily integrity" implicating individuals' expectations of privacy]). The material extracted from defendant here contains the genetic, biological, and chemical essence of a human being. Indeed, "[o]ne can think of few subject areas more personal and more likely to implicate privacy interests than that of one's . . . genetic make-up" (*Norman-Bloodsaw v Lawrence Berkeley Lab*, 135 F3d 1260, 1269 [9th Cir 1998]). A person's genetic material

contains not only a blueprint of their most intimate details—the basic building blocks of their physical characteristics, their propensity for certain diseases and medical conditions—but also carries with it similarly private information about their close and distant relatives. The collection of bodily material containing such a treasure trove of private information is deeply concerning (*see King*, 569 US at 482 [Scalia, J., dissenting] ["Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection"]). Yet the majority minimizes these privacy concerns, deeming a buccal swab to be a "gentle process," less invasive than drawing blood (majority op at 10-11, quoting *King*, 569 US at 446). But "why are the privacy-related concerns not . . . weighty when an intrusion into the body is at stake?" After all, the "Fourth Amendment lists 'persons' first among the entities protected against unreasonable searches and seizures" (*King*, 569 US at 469 [Scalia, J., dissenting]). That material, even if contained in saliva, is entitled to the same safeguards against unlawful government collection as a blood sample or hair follicle (*see Abe A.*, 56 NY2d at 299; *Barber*, 72 AD2d at 352-353; *Schmerber*, 384 US at 769).

D.

<u>*Abe A.* Guarantees the Right to Notice and a Meaningful Opportunity to be Heard at an</u>

<u>Adversarial Hearing Before Bodily Evidence May be Seized</u>

If the *Abe A.* safeguards are workable, then why discard them? Now we reach the nub of the problem: the majority rejects the idea that, absent an exigency, government should present its evidence in an adversarial hearing on a request for corporeal evidence.

But as explained in *Abe A.*, that is what the Constitution requires. The majority views such a hearing as unnecessary—apparently counsel has nothing to add on the question of whether the court should issue a warrant permitting a bodily invasion of a suspect. The majority assumes participation by a neutral magistrate is all that is needed to protect an individual's rights. But, of course, that is not the case. Obviously, the government official requesting the warrant will not argue against their interest, and so our system assumes that the adversarial nature of the proceeding will sharpen the presentation of arguments that inform and aid the neutral decisionmaker.

The question presented on this appeal is not whether a government official may seek a warrant upon probable cause—that of course is the government's burden, well established under the law, recognized by the prosecution and defendant here, and not in dispute. Nor is there doubt that an official may seek a warrant ex parte. That, too, is a well understood and accepted practice and a necessary tool of law enforcement. Nor is the issue whether a suspect of a crime is entitled to discovery on a warrant application, a characterization invented by the majority. At the time of the warrant request, defendant was an uncharged suspect in the shooting, so "discovery," as that legal term is commonly understood, had no application to his situation. Rather, the issue in this appeal concerns the basic right to be notified of the government's request for corporeal evidence and to be afforded an opportunity to speak against it.

The majority determines that defendant received notice and an opportunity to be heard and so declines to address the prosecution's express, preserved grounds for reversal that no notice is required for a buccal swab or for a suspect in custody (majority op at 15). That is a striking conclusion, especially since the majority explains how defendant was denied access to the warrant application and was not permitted to question the prosecution's witness or controvert the warrant in any way because the judge excluded counsel from the evidentiary hearing (*id.* at 4-5). Nonetheless, the majority suggests that the stringent *Abe A.* test is not implicated because "[d]efense counsel, having received notice of the hearing on the warrant, was given an opportunity to be heard on the application, other than on the issue of probable cause" (*id.* at 14). But the question of probable cause—exactly the issue counsel sought to address during the hearing—is central to the *Abe A.* inquiry (56 NY2d at 291).

Contrary to the majority's selective references to the record, counsel did not have an opportunity to be heard on whether the warrant should issue. The judge predetermined that issue and made clear that counsel had no right to be heard on the merits of the application, essentially showing counsel to the courtroom door. From the beginning, the judge made abundantly clear his view that counsel was not authorized to so much as attend the hearing: "At this point I don't believe that [defense counsel] has a right to be present, but . . . I will allow him to appear in the following limited manner[:] . . . I will allow him a short statement in advance of the application." This proved to be a meaningless exercise: "I disagree with you as you know, with respect to the fact that you should be noticed. I

think that it is not true that you should be noticed or even present frankly, as will be evident

in the fact that you'll be excused momentarily while the application for the search warrant

is made." As the record makes clear, counsel was only permitted to address why he should

participate in the hearing. An opportunity to argue for an opportunity to argue is not due

process (*see Ramos*, 85 NY2d at 683-684; *Mullane v Central Hanover Bank & Trust Co.*,

339 US 306, 314 [1950] [notice must be "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them

an opportunity to present their objections"]; *Lankford v Idaho*, 500 US 110, 126 n 22 [1991]

["In a variety of contexts, our cases have repeatedly emphasized the importance of giving

the parties sufficient notice to enable them to identify the issues on which a decision may

turn"]).

Of course, nothing in the *Abe A.* framework forecloses the government from making

a showing that its application and the evidence in support, or any part of it, should not be

revealed to counsel and the suspect. The government knows how to argue that divulging

certain information to a suspect presents the risk of destruction of evidence or witness

intimidation and, in the case of a suspect at liberty, the possibility of flight from the

jurisdiction (*see e.g. People v Liberatore*, 79 NY2d 208, 215 [1992] ["We have noted that

where the disclosure of the identity of an informant is pertinent to establishing probable

cause for arrest and search, an ex parte in camera hearing with respect to the existence of

the informant and the alleged communication from that person strikes a proper balance

between the defendant's rights and the competing interests of the State"]; *People v Castillo*,

176 AD2d 609, 609 [1st Dept 1991], *affd*, 80 NY2d 578 [1992] ["(T)he People moved for a protective order denying disclosure to the defense of the affidavit supporting the search warrant on the ground that this information might reveal the identity of the confidential informant and pose a safety risk to the individual's life"]). A judge considering the warrant application may be persuaded by these arguments, but the judge cannot, as was done here, refuse to allow counsel to object on the merits when no such showing of exigency has been made. And while the nature of the bodily evidence at issue here meant—as in *Abe A.*—that there was no risk of destruction and, therefore, no exigency justifying the seizure of defendant's bodily material without notice or an opportunity to be heard, that will not always be the case for all bodily evidence (*see e.g. Schmerber*, 384 US at 770-771 [holding that the warrantless drawing of blood from individual suspected of drunk driving was justified because of the rapidly diminishing presence of alcohol in blood]).

Clearly, then, law enforcement may protect its investigatory process. Exclusion of counsel from warrant hearings may frequently be appropriate, but, in the case of warrants for corporeal evidence, it is not the constitutional default that the majority assumes. Indeed, the majority never confronts the fact that society tolerates ex parte warrants based upon a careful balancing of the rights of the individual against legitimate government interests. But, "when frustration of the purpose of the application is not at risk, it is an elementary tenet of due process that the target of the application be afforded the opportunity to be heard in opposition before [their] constitutional right to be left alone may be infringed" (*Abe A.*, 56 NY2d at 296). I cannot see how the risks that support issuance of an ex parte

warrant exist as a matter of law when the suspect is in custody. It is baffling that, under the majority analysis, someone under government control cannot object before collection of their DNA, even though that person presents absolutely no risk of flight and could not possibly destroy the bodily evidence the government seeks. But, if a legitimate government interest is jeopardized by the procedure adopted in *Abe A.*, then the government need only carry its burden to demonstrate as much.

Defendant was entitled to, and denied, the opportunity to challenge the search warrant at an adversarial hearing upon notice of the warrant application's contents, before issuance of the warrant and collection of defendant's DNA.[4] The assistant district attorney could have explained, but did not, that the evidence should remain confidential, a burden squarely placed on the applicant for the warrant. Accordingly, the Appellate Division properly granted defendant's motion to suppress.

---

[4] Because *Abe A.*'s analytic framework applies regardless of an individual's custodial status, I have no occasion to consider whether, in the context of a warrant application for bodily evidence, a person in custody retains some privacy interest against a first-level "seizure" conducted solely to accomplish a second-level search and seizure of the evidence (*Abe A.*, 56 NY2d at 295; *see also Whitaker*, 64 NY2d at 351 ["(A) person does not lose all 4th Amendment rights once he has been lawfully incarcerated"]; *People v Hall*, 10 NY3d 303, 318 [2008] [Ciparick, J., concurring]; *King*, 569 US at 469-470 [Scalia, J., dissenting]).

III.

Even though the majority incorrectly holds that the collection of defendant's DNA was constitutional, defendant is still entitled to a new trial based on the court's improper admission of a prejudicial, unauthenticated redacted music video.

A.

The Prosecutor's Authentication Evidence

Over counsel's objection, the court admitted into evidence a redacted video that the prosecutor argued depicted defendant singing lyrics to a song titled "Mobbin' Out," the full version of which was uploaded first to YouTube eleven days after the shooting and then to the website World Star Hip Hop two weeks later. As redacted, the video depicts several young men gathered on the street, walking along to lyrics that reference gang violence. According to the prosecutor, the video established motive by showing defendant rapping about how his crew operated—going into an area and hopping out (of a car) to attack a victim rather than in the course of a drive-by shooting. The prosecutor argued that the described conduct mirrored the crime, that the video supported the prosecution's theory that there was a rivalry between defendant's and another crew, and that the two individuals KG identified as seated in the car's backseat were known to defendant as they are also visible in the video.

To authenticate the video, the prosecution presented testimony from KG and a detective that the redacted video was an accurate representation of what they had viewed

on the Internet. KG further testified that he received, but declined, an invitation from defendant to attend the filming of a music video shortly after the crime and which he presumed was the video he viewed before trial in the assistant district attorney's office. Both witnesses testified that defendant's nickname and crew affiliations were included in the video and identified him lip syncing to lyrics about violent actions.[5]

The court concluded that defendant's invitation to KG to participate in filming a music video combined with the uploading of the video to YouTube by an unknown person eleven days later were sufficient to authenticate the redacted video. During its final charge, the court instructed the jury that the video could not be used as propensity evidence.

B.

The Prosecutor Failed to Establish the Redacted Video Was Unaltered

"[I]n determining whether a proper foundation has been laid for the introduction of real evidence, the accuracy of the object itself is the focus of inquiry" (*McGee*, 49 NY2d at 59). There must be proof that the proffered evidence "is genuine and that there has been no tampering with it" (*id.*). That proof may be direct or circumstantial, and reasonable

---

[5] Counsel objected on the grounds that preclusion was appropriate because of the prosecutor's belated disclosure (after jury selection and before opening statements) despite her knowledge of the video prior to trial, and that the lyrics were prejudicial and not probative. Counsel also argued that the video was irrelevant to the prosecutor's stated purpose for seeking to admit it. The court stated that, with redactions, there was limited prejudice to defendant and that the video corroborated evidence about defendant's membership in a gang. At trial, counsel again objected to the video's admission, arguing that the prosecution's proffered evidence did not authenticate the video because no information established the manner and time of the video's creation nor its accuracy. In any case, it was inadmissible propensity evidence.

inferences are permissible as long as they are not "too tenuous and amorphous" (*Price*, 29 NY3d at 481, citing *People v Patterson*, 93 NY2d 80, 85 [1999]). While courts have identified some recognized methods for authentication, these serve as nonexclusive examples of the means to establish reliability and authenticity. The trial court makes a threshold determination as to reliability based on the specific facts of the case and the intended purpose of the item to be authenticated (*People v Julian*, 41 NY2d 340, 343 [1977]). Essentially, the question presented to the trial court is whether the evidence proffered is a fair and accurate representation of what the party offering the evidence claims it to be. For example, that an audio recording accurately captures the contents of a conversation, that a video accurately depicts how an event transpired, or that a still or moving image accurately represents what the eye perceived when the image was recorded (*see Price*, 29 NY3d at 476; *Patterson*, 93 NY2d at 84; *People v Ely*, 68 NY2d 520, 528-529 [1986]; *People v Byrnes*, 33 NY2d 343, 347 [1974]).

"[A] videotape may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted" (*Patterson*, 93 NY2d at 84). Here, the prosecutor did not rely on these traditional methods of authentication. Instead, the prosecutor's evidence consisted of testimony from KG and a detective that the video shown in court accurately reflected the video they had viewed on the websites, and KG's testimony that, the day after the shooting, defendant "asked [him] to come down for his video shoot and stuff" and that KG saw a music video posted on YouTube after the shooting

depicting defendant which KG believed was the one that defendant had invited him to participate in filming. But KG had no first-hand knowledge that the video was ever made and, if it was, that the prosecution's trial exhibit was in fact that video. Moreover, he did not testify as to whether the video he watched online had been altered before it was uploaded.[6] Simply stated, the evidence failed to establish the origins of the video and that the images and sounds therein were unaltered.

Defendant argues that the video was manipulated because the lyrics appear lip-synced, meaning that the singing was added post-production after the video was recorded. The prosecution's reply is telling. Rather than deny that the video is lip-synced and point to supporting record evidence, the reply distracts and says that whether the video was lip-synced is a weight of the evidence argument.[7] That is a fundamental misunderstanding of New York's authentication jurisprudence. Whether defendant actually sang the lyrics heard in the video or intended their addition post-production goes to the core foundational authentication question of whether the video accurately depicts defendant's actions (*McGee*, 49 NY2d at 59; *Price*, 29 NY3d at 476). The fact is that the record contains no

---

[6] Although the prosecutor claims that a video would be tremendously difficult to fake, no evidence was offered at trial to support this bare assertion.

[7] The prosecution cites two out-of-state cases for this proposition. As to *People v Gray*, the authentication evidence proffered there (testimony establishing that the video played in court was the same as the one viewed online, rather than establishing that the video accurately represented what it purported to depict) is indistinguishable from the authentication evidence held insufficient by this Court in *Price*. *People v Torres* is an unpublished case, which the California court has instructed "must not be cited or relied on by a court or a party in any other action" (Cal R of Ct, R 8.1115). I have no basis to ignore the wishes of that court and do not consider the case, notwithstanding the reference in the prosecution's briefing.

evidence as to who wrote or sang those lyrics and whether, at the time the video was recorded, defendant was lip-syncing the same words as heard in the video. Nor was there evidence that defendant was even present for post-production editing.

The majority's assertion that defendant did not dispute his presence in the video or that he was "reciting certain words" is belied by the fact that defendant objected to the video on authentication grounds. In any case, appearing to recite certain words does not mean that defendant actually recited the exact words heard in the redacted video, which of course was the point of its admission. The primary purpose of authentication is to ensure the evidence admitted for the jury's consideration is genuine and unaltered (*id.*; *McGee*, 49 NY2d at 59 ["Accuracy or authenticity is established by proof that the offered evidence is genuine and that there has been no tampering with it"] [internal citation omitted]). As *Patterson* warns, "the obligation and need for responsible accuracy and careful reliability should not be sacrificed to some of the whims and weaknesses of fast moving and rapidly changing technology" (93 NY2d at 84).

The prosecution's alternative response, that the video was also offered to show that defendant knew the passengers in KG's car, does not address the accuracy of the video itself. In any case, this purpose could have been achieved by the admission of properly authenticated still shots, rather than the redacted video which, as I discuss below, prejudicially depicted defendant as embracing a gangster lifestyle. Moreover, KG's identification of two individuals in the video, who he testified were passengers in his car at the time of the shooting, does not support admission of the gang-related evidence present

in the imagery and lyrics of the video. The point was not lost on the trial judge, who required redactions of various images and corresponding audio in the full-length video.

Although in *Price* we did not announce an authentication rule to address the unique aspects of social media images, a comparison of the proffer here with the proffer in that case is instructive. In *Price*, the prosecutor intended to move into evidence a photograph appearing to depict the defendant holding money and a gun nearly identical to the one used in the charged robbery. The prosecutor argued that the photograph would be authenticated by testimony that a detective obtained the photograph from a social media profile whose username contained the defendant's surname and on which page there were multiple other photographs of the defendant. Additionally, the prosecutor relied on the testimony of the victim that the gun looked like the one used in the robbery and the testimony of the detective that the individual in the photograph was the defendant. (*Price*, 29 NY3d at 474-475.)  "However, the detective admitted that she did not know who took the photograph, when it was taken, where it was taken, or under what circumstances it was taken. Nor did she know whether the photograph had been altered or was a genuine depiction of that which it appeared to depict" (*id.* at 475).

Both the majority and concurrence in *Price* applied the traditional test for authentication to a digital image taken from a social media website and found the evidence insufficient. The majority held that the prosecution was required "to demonstrate that the photograph was a fair and accurate representation of that which it purported to depict" (*Price*, 29 NY3d at 480). Since the prosecution did not present testimony as to the

photograph's accuracy from someone present when it was taken, nor expert testimony establishing that the photograph was unaltered, the majority held that the prosecution had failed to satisfy any of the traditional authentication methods (*id.* at 478–79). The evidence could not satisfy the alternative test proposed by the prosecution because the prosecutor failed to produce any evidence that the defendant controlled the social media accounts that had uploaded the video (*see id.* at 479). In my concurrence, I concluded the proffer fell short because it failed to establish that the defendant had dominion and control over the webpage at issue.

As in *Price*, the prosecution here did not satisfy the traditional test for authentication. There was no testimony from anyone involved in the video's creation, nor was there any expert testimony as to the video's unaltered state. The fact that the prosecutor here could not establish that defendant posted the unredacted video to YouTube and World Star Hip Hop, or that he had dominion and control over the accounts that uploaded the video to those sites, only further confirms that on this record it was error to admit the redacted video (*see id.* at 478 [noting that, even under the proposed alternative test, the authentication requirement "cannot be satisfied solely by proof that defendant's surname and picture appears [sic] on the profile page" containing the incriminating photograph of the defendant]).

Nor does the evidence suffice under the prosecution's proposed multifactor authentication rule. First, the factors listed are generally considered under the traditional methods for authentication (*see e.g. Patterson*, 93 NY2d at 84 [noting that "videotapes . .

. are ordinarily admissible under standard evidentiary rubrics" for authentication, "including technically acceptable self-authentication techniques"]). Confusingly, although the prosecution states that the factors are intended to be non-exclusive, with no one factor afforded dispositive weight, the first factor proposed here asks whether the evidence was authenticated under traditional means. However, as the prosecution acknowledges, if the traditional test is satisfied, no more is required and the analysis ends (*see id.*; *Price*, 29 NY3d at 477-478; *McGee*, 49 NY2d at 59-60). The prosecutor could not satisfy, and did not even rely on, traditional methods of authentication. The other proposed factors do not establish that the video was unaltered.

The majority's reliance on three cases from other jurisdictions to support their conclusion that the video was authenticated is misplaced, as each is distinguishable on the facts, rendering them wholly irrelevant to our analysis. In each case, the proffered authentication evidence was stronger than the proffered evidence at defendant's trial. In *United States v Pettway*, a witness "explained the source of the video, how he discovered it, and identified Defendant as the person depicted in the video" and at least one witness testified that he recognized the defendant's voice on the video (2018 WL 4958962, *6 [WD NY, Oct 15, 2018]). Nothing close to that type of linkage evidence was presented at defendant Goldman's trial. In *United States v Washington*, the defendant admitted he was in a music video recorded a month before he was arrested (2017 WL 3642112, *2 [ND Ill,

E Div, Aug 24, 2017]).[8] Similarly, in the lone New York case cited by the majority, *People v Franzese*, the video was authenticated "by the defendant's own admissions about the video made in a phone call while he was housed at Rikers Island," a YouTube certification indicating when the video was posted, and testimony from an officer who viewed the video at about that time (154 AD3d 706, 707 [2d Dept 2017]).

The majority also asserts that the purpose for which the redacted video was offered is relevant to the authentication inquiry but never explains how that matters to the foundational question of the redacted video's authenticity. Either the prosecutor presented evidence that the video is accurate and unaltered or failed to do so. The prosecutor did not establish that the words to the song were recorded live rather than added post-production (indeed, it seems clear that they were), and no evidence established either that it was defendant's voice or that he was lip-syncing the words actually heard in the redacted video. Thus, to the extent that the video was admitted for the purpose of establishing that defendant rapped about things he had actually done, nothing demonstrated the redacted video's authenticity.

In my view, our sister high court in New Jersey adopted the right approach in *State v Skinner* (218 NJ 496 [2014]). The court held that "rap lyrics . . . may not be used as evidence of motive and intent except when such material has a direct connection to the specifics of the offense for which it is offered in evidence and the evidence's probative

---

[8] The court ultimately granted defendant's motion to exclude the YouTube music video because the lyrics and images were more likely to be unfairly prejudicial than probative (*Washington*, WL 3642112, *6).

value is not outweighed by its apparent prejudice" (*id.* at 524). Just so here, where the video and the lyrics do not showcase or describe the crime for which defendant was convicted nor his involvement in the shooting.

The court's admission of the video was an abuse of discretion as a matter of law (*see Patterson*, 93 NY2d at 84 [noting that a trial court's "decision to admit or exclude videotape evidence . . . may be disturbed by this Court . . . when no legal foundation has been proffered"], quoting Prince, Richardson on Evidence § 4-214 [Farrell 11th ed]). The redacted video tainted the jury's deliberative process by depicting defendant as glorifying street violence and embracing gang life. The redacted video is no more than propensity evidence that suggested to the jurors defendant's penchant for the behavior lionized by these lyrics or his guilt based on his gang association. Indeed, the prosecutor argued in summation that the video was an example of life imitating art. The fact that the jury requested to see the video during its deliberations confirms its highly prejudicial influence on the jury (*see e.g. People v Rupnarine*, 140 AD3d 1204, 1205 [3d Dept 2016] [opining that the jury's request to have portion of the transcript reread demonstrated its focus on prejudicial statements by prosecutor]).

That prejudicial effect was not ameliorated by the evidence against defendant. The DNA evidence showed only that defendant had been in KG's vehicle at some point but not exactly when. Indeed, KG admitted that defendant had been in his vehicle several times in the weeks preceding the shooting. Nor did surveillance footage identify defendant as the shooter. Instead, one eyewitness testified that someone in a white tee-shirt—an outfit the

witness described as the "basic uniform" of youths during the summer—fired the gun. The prosecution's case turned entirely on the testimony of KG, who testified in exchange for leniency and whose version of events—including his initial identification of someone else as the shooter—changed after he entered into the cooperation agreement with the prosecution.

## IV.

To be clear, the majority has upset established precedent in two areas of law. First, the majority has sanctioned the government's ex parte request to remove genetic material from a suspect, without a showing of a risk of flight or destruction of the potential evidence, because the bodily intrusion is "minimal" (majority op at 12). This reductive analysis effectively normalizes bodily invasions as routine procedures, untethered from the legitimate needs of law enforcement based on the facts of the case. Second, the majority has eroded our rule of authentication by tolerating evidence without proof of its unaltered state.

I would therefore affirm the Appellate Division's order reversing defendant's conviction and ordering a new trial because he was denied the basic notice and opportunity to be heard in opposition to the State's request to take a sample of his DNA, and the erroneous admission of the unauthenticated video was an abuse of discretion as a matter of law that was not harmless.

Order reversed, defendant's motion to suppress denied, and case remitted to the Appellate Division, First Department, for determination of the facts and issues raised but not determined on appeal to that Court. Opinion by Chief Judge DiFiore. Judges Stein, Garcia and Feinman concur. Judge Fahey concurs in result in an opinion. Judge Rivera dissents and votes to affirm in an opinion in which Judge Wilson concurs.

Decided October 22, 2020